[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 20-11965

_____

D.C. Docket No. 3:19-cv-00012-TCB


KEELAN SWINT,

Plaintiff-Appellant,

versus

CITY OF CARROLLTON, GEORGIA,
TIMOTHY GRIZZARD,
FAITH PULLEN,
PETER MAIERHOFER,
JULIE IVEY,

Defendants-Appellees.


_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(June 2, 2021)

Before WILLIAM PRYOR, Chief Judge, LUCK, Circuit Judge, and MARKS,[*] District Judge.

PER CURIAM:

This appeal involves a complaint of retaliation brought by a former public employee against a city and its officials. When her supervisors informed Keelan Swint that her position with the city government was being eliminated because of low participation in the programs she oversaw, they offered to reassign her but with several conditions, including that she stop interfering in the personnel matters of her former department. When her supervisors explained these conditions to her, she started hyperventilating and suffered a panic attack. She brought several claims under federal and state law against the city and the officials who supervised her, including infringement of her associational rights, retaliation, and intentional infliction of emotional distress. The district court granted summary judgment in favor of the defendants. We conclude that the defendants are entitled to summary judgment on the federal claims based on qualified immunity for the officials and the absence of municipal liability for the city. We also conclude that Swint did not plead a free-speech claim. And we conclude that Swint's state-law claims of retaliation and intentional infliction of emotional distress fail. We affirm.

---

[*] Honorable Emily Coody Marks, Chief United States District Judge for the Middle District of Alabama, sitting by designation.

## I. BACKGROUND

Keelan Swint began working for the City of Carrollton, Georgia, in 2002 as a custodian. In 2016, she was promoted to facility supervisor of the Carrollton Cultural Arts Center. And in 2017, she was transferred to the parks and recreation department to work as an athletic coordinator. In that position, she reported to Julie Ivey.

In January 2018, Swint spoke with a woman who had just quit her job at the Cultural Arts Center. During the conversation, the woman said she believed that another employee at the Center had raped a volunteer who was a minor. Swint reported the allegation to the director of the parks and recreation department, Peter Maierhofer, who passed the information on to the city's director of human resources, Faith Pullen. Pullen and the city manager, Timothy Grizzard, met with Swint. They asked her if she had spoken with anyone other than Maierhofer about the allegation, and she answered that she had informed two other city employees. They ordered her not to speak about it with anyone else.

Grizzard and Pullen reported the allegation to the police department. A detective interviewed the alleged victim, who denied having been raped. The detective closed the investigation as "unfounded due to no crime occurring" and notified Grizzard and Pullen of his findings.

3

In March 2018, Maierhofer informed Swint that the city planned to eliminate her position in the parks and recreation department because of low participation in the programs she oversaw. He told her she could continue working for the city by accepting reassignment to a maintenance position that had just become vacant, but she would have to take a pay cut and the city would have to lay off her son, who was also an employee. Swint reluctantly accepted the offer.

Grizzard, Pullen, Maierhofer, and Ivey later amended the terms of Swint's continued employment. They agreed that she could keep her former salary and continue reporting to Ivey instead of to a new supervisor. But she would have to accept several new conditions of employment, which they explained in a letter. The first condition stated, "Do not involve yourself in anything associated with the Cultural Arts Center," especially "matters concerning pending litigation, past or current employees, volunteers, or anyone associated with the Cultural Arts Center," "unless you are specifically directed to do so by your chain of command." Other conditions prohibited her from discussing her salary, the job performance of other employees, and other sensitive matters with anyone other than her supervisors, the human resources department, or law enforcement. She was also prohibited from "mak[ing] threatening or disrespectful remarks or threats of legal action about other employees, [her] chain of command, or elected officials" because such comments were "a serious form of insubordination." The last

condition directed Swint to "sign this letter acknowledging that you have received and read the letter and its conditions." The letter warned that failure to adhere to the conditions could result in disciplinary action, including reduction in pay or termination.

Pullen, Maierhofer, and Ivey met with Swint on March 15, 2018. Maierhofer tried to read the letter to Swint, but she periodically interrupted him to say that the allegations were false and that she was being "railroaded." As the meeting progressed, she became more upset and started hyperventilating. Her husband picked her up from work and took her to the emergency room. According to Pullen, Swint resigned from her job during the meeting. Swint contends that she did not resign and was instead fired for refusing to sign the letter.

Swint sued the city and the four officials involved in her alleged termination—Grizzard, Pullen, Maierhofer, and Ivey—and pleaded four counts in her complaint. First, she alleged that the defendants violated her right to freedom of association. U.S. Const. amends. I, XIV; 42 U.S.C. § 1983. Second, she alleged that they violated her constitutional rights by retaliating against her for refusing to sign the letter. U.S. Const. amends. I, XIV; 42 U.S.C. § 1983. Third, she alleged that the city violated the Georgia Whistleblower Act by retaliating against her for disclosing the rape allegation. Ga. Code Ann. § 45-1-4. Finally, she brought a

claim against the officials of intentional infliction of emotional distress based on the panic attack that she suffered during the meeting.

The district court granted summary judgment to the defendants. It ruled that the city and the officials were entitled to summary judgment on the federal claims because they had not limited any of Swint's protected associational activities and because the speech for which they had allegedly retaliated against her was not a matter of public concern. It also rejected Swint's late attempt to raise a free-speech claim because she had made only passing references to freedom of speech in her complaint. Next, it ruled that, under the Georgia Whistleblower Act, Swint established a prima facie case of retaliation but that she failed to introduce evidence that the proffered reasons for reassignment and dismissal were pretextual. Finally, it ruled that Swint's claim for intentional infliction of emotional distress failed because reading a letter containing employment conditions is not outrageous and extreme conduct and because no jury could find that the defendants intended to harm Swint.

## II. STANDARD OF REVIEW

We review a summary judgment *de novo*. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1117 (11th Cir. 1993). "[We] may affirm if there exists any adequate ground for doing so, regardless of whether it is the one on which the district court relied." *Id.*

6

### III. DISCUSSION

We divide our discussion in four parts. We begin with the federal claims and conclude that the city and officials are entitled to summary judgment based on qualified immunity and the absence of municipal liability. Next, we conclude that Swint did not plead a free-speech claim. We then turn to the retaliation claim under the Georgia Whistleblower Act and Swint's failure to establish that the proffered reasons for her reassignment and termination were pretextual. Finally, we address the claim of intentional infliction of emotional distress and conclude that the officials did not intentionally or recklessly engage in extreme and outrageous conduct.

### A. *The City and Officials Are Entitled to Summary Judgment on the Federal Claims.*

The city and its officials present separate arguments about Swint's federal claims. The city argues that it is entitled to summary judgment on the federal claims because Swint did not identify an official policy or an unwritten custom or practice that caused the alleged constitutional violations. And the officials argue that they are entitled to summary judgment based on qualified immunity. We address each argument in turn.

Municipalities may not be held liable under section 1983 on a theory of *respondeat superior*. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Instead, municipal liability attaches "only when municipal 'official policy' causes

a constitutional violation." *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998) (citing *Monell*, 436 U.S. at 694–95). A plaintiff must identify either "an officially promulgated [municipal] policy" or "an unofficial custom or practice of the [municipality] shown through the repeated acts of a final policymaker for the [municipality]." *Grech v. Clayton County*, 335 F.3d 1326, 1329 (11th Cir. 2003) (en banc).

The city is not liable for the federal claims. Swint did not identify an officially promulgated city policy that deprived city employees of their associational rights or that punished them for engaging in protected activity. Nor did she offer any examples of city officials repeatedly depriving employees of their First Amendment rights or repeatedly retaliating against employees for exercising those rights. She contends that the city is liable under a narrow exception to the general rule wherein "municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). She argues that Grizzard was a final policymaker because, as the city manager, he supervised all city employees. But we have clarified that "a municipal official does not have final policymaking authority over a particular subject matter when that official's decisions are subject to meaningful administrative review." *Morro v. City of Birmingham*, 117 F.3d 508, 514 (11th Cir. 1997). Because Swint did not develop the record with evidence that

8

employment decisions by the city manager of Carrollton are insulated from meaningful administrative review, she has failed to establish that liability against the city may be premised on a single act by Grizzard. *Cf. Manor Healthcare Corp. v. Lomelo*, 929 F.2d 633, 636–37, 640 (11th Cir. 1991) (affirming the decision of the district court that the plaintiff "failed to show [as] an essential element of its case" that the defendant had final policymaking authority).

As for the officials, qualified immunity protects them "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Priester v. City of Riviera Beach*, 208 F.3d 919, 925 (11th Cir. 2000) (internal quotation marks omitted). For a right to be "clearly established," a plaintiff must identify either "case law with indistinguishable facts," "a broad statement of principle within the Constitution, statute, or case law," or "conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Crocker v. Beatty*, 995 F.3d 1232, 1240 (11th Cir. 2021) (internal quotation marks omitted). When a plaintiff relies on the second and third categories, the "general rule" she is invoking "must apply with *obvious clarity* to the circumstances." *Id.* (alterations adopted) (internal quotation marks omitted). Because "the Supreme Court has warned us not to 'define clearly established law at a high level of

9

generality,'" these categories are rarely satisfied. *Id.* (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)).

The officials are entitled to qualified immunity. Swint cites no case law with similar facts to show that the conditions in her employment letter or the requirement that she sign the letter violated her constitutional rights. And her arguments about general First Amendment principles are too abstract to make it obvious that the officials' conduct violated her rights.

### B. Swint Did Not Plead a Free-Speech Claim.

A claim for relief requires "a short and plain statement . . . showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). One of the purposes of this rule is "to require the pleader to present his claims discretely and succinctly, so that his adversary can discern what he is claiming and frame a responsive pleading." *Barmapov v. Amuial*, 986 F.3d 1321, 1324 (11th Cir. 2021) (alteration adopted) (internal quotation marks omitted). The rule was "also written for the benefit of the court, which must be able to determine which facts support which claims, whether the plaintiff has stated any claims upon which relief can be granted, and whether evidence introduced at trial is relevant." *Id.* (internal quotation marks omitted). Although "the Supreme Court has mandated a liberal pleading standard for civil complaints under Federal Rule of Civil Procedure 8(a)," that standard is "inapplicable after discovery has commenced." *Gilmour v. Gates, McDonald &*

10

*Co.*, 382 F.3d 1312, 1314–15 (11th Cir. 2004). Rule 8(a) "does not afford plaintiffs with an opportunity to raise new claims at the summary judgment stage." *Id.* at 1314. A plaintiff who wants to allege a new claim must obtain the consent of the opposing party or move the district court for leave to amend her complaint; she cannot unilaterally amend her complaint in a brief opposing summary judgment. Fed. R. Civ. P. 15(a); *Gilmour*, 382 F.3d at 1315.

The district court concluded that Swint did not assert a discrete free-speech claim because she did not list one as a separate count and made only passing references to the freedom of speech in her complaint. Swint argues on appeal that she did plead a violation of her right to freedom of speech and that the district court failed to analyze the sufficiency of her claim under the liberal pleading standard of Federal Rule of Civil Procedure 8(a)(2). She asserts that the defendants had adequate notice of her free-speech claim.

We agree with the district court: Swint did not plead a separate claim involving her freedom of speech. She listed four counts in her complaint: violation of her "[f]reedom of [a]ssociation" under the First and Fourteenth Amendments; retaliation under the First and Fourteenth Amendments; retaliation under the Georgia Whistleblower Act; and intentional infliction of emotional distress under state common law. Her passing references to the freedom of speech in the first two counts did not put her adversaries on notice that she was alleging a violation of her

11

freedom of speech. *See Barmapov*, 986 F.3d at 1324. Moreover, when the district court ruled at the summary-judgment stage, it was not required to apply a liberal pleading standard. *Gilmour*, 382 F.3d at 1315. The district court did not err.

### C. The City Is Entitled to Summary Judgment on the Retaliation Claim Under the Georgia Whistleblower Act.

The Georgia Whistleblower Act prohibits retaliation by a public employer against a public employee "for disclosing a violation of or noncompliance with a law, rule, or regulation to either a supervisor or a government agency, unless the disclosure was made with knowledge that the disclosure was false or with reckless disregard for its truth or falsity." Ga. Code Ann. § 45-1-4(d)(2). Georgia applies the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to claims brought under the Act. *Forrester v. Ga. Dep't of Hum. Servs.*, 708 S.E.2d 660, 665–66 (Ga. Ct. App. 2011).

Under the *McDonnell Douglas* framework, the plaintiff must first establish a prima facie case of retaliation. *Id.* at 666. If a prima facie case is established, the burden shifts to the employer to "articulate a legitimate, non-retaliatory reason for the adverse employment action taken." *Id.* If the employer offers a legitimate, non-retaliatory reason, the burden shifts back to the plaintiff to establish that the proffered reason for its action is pretextual. *Id.*

"Pretext is established by a direct showing that [an illicit] reason more likely motivated the employer or by an indirect showing that the employer's explanation

12

is not credible." *Blockum v. Fieldale Farms Corp.*, 573 S.E.2d 36, 40 (Ga. 2002) (internal quotation marks omitted). A proffered reason is not pretextual unless a plaintiff proves both that the proffered reason was false and that retaliation was the real reason. *See Brooks v. Cnty. Comm'n of Jefferson Cnty.*, 446 F.3d 1160, 1163 (11th Cir. 2006). A plaintiff must rebut each of the employer's proffered reasons. *Crawford v. City of Fairburn*, 482 F.3d 1305, 1309 (11th Cir. 2007).

The district court applied the *McDonnell Douglas* framework and concluded that Swint's retaliation claim failed. It first determined that Swint had established a prima facie case of retaliation under the Act because the city is a public employer, Swint's reporting of the alleged rape was a disclosure of a violation of the law, her reassignment and termination were adverse employment actions, and the disclosure and adverse employment actions were close enough in time to each other to infer a causal connection. *See* Ga. Code Ann. § 45-1-4(d)(2); *Forrester*, 708 S.E.2d at 666. It then accepted the city's two legitimate, non-retaliatory reasons for the adverse employment actions: Swint was reassigned because her original position was eliminated due to low participation in the programs she oversaw, and she was terminated because she refused to sign the letter or to make a statement refuting the letter. Finally, the district court explained that Swint had made no attempt to show that the articulated reasons were pretextual. Because Swint effectively abandoned

13

her argument at the final step of the *McDonnell Douglas* framework, the city was entitled to summary judgment.

Swint makes three arguments on appeal. First, she contends that she produced direct evidence of retaliation in the form of a secret recording she made of a telephone conversation with Grizzard. According to Swint, Grizzard said in this recording that he was "not going up to bat" for her to keep her old position because of the many times she had meddled in the business of the Cultural Arts Center, including when she reported the alleged rape. Second, she contends that she did argue below that the city's proffered reasons were pretextual. Finally, she argues that she presented a "convincing mosaic" of circumstantial evidence that would allow a jury to infer that the city had illegally retaliated against her.

Each argument fails. First, Swint did not provide direct evidence of retaliation because "only the most blatant remarks, whose intent could mean nothing other than to [retaliate]," may constitute direct evidence. *Jones v. Gulf Coast Health Care of Del., LLC*, 854 F.3d 1261, 1270 (11th Cir. 2017) (internal quotation marks omitted). Grizzard's purported statement that he was "not going up to bat" for Swint is not so blatant that the only explanation for it is an intent to retaliate. Indeed, Swint admits that Grizzard said during their telephone conversation that he reassigned her because there was not enough work for her in her old position. Second, Swint did not argue in the district court that the city's

14

proffered reasons were pretextual. The only times she mentioned pretext were when she recited the *McDonnell Douglas* framework. Finally, she never argued to the district court that a "convincing mosaic" of circumstantial evidence was sufficient for a retaliation claim. We ordinarily will not address an argument that is raised for the first time on appeal. *Access Now*, 385 F.3d at 1335. And even if Swint had made this argument to the district court, Georgia law requires her to satisfy the *McDonnell Douglas* framework. *See Forrester*, 708 S.E.2d at 665–66. She cites no authority stating that a claim under the Georgia Whistleblower Act can be evaluated under a "convincing mosaic" of circumstantial evidence or any other alternative framework. The district court committed no error.

### D. The Officials' Conduct Was Neither "Intentional or Reckless" Nor "Extreme and Outrageous."

To succeed on a claim of intentional infliction of emotional distress under Georgia law, a plaintiff must prove that the alleged wrongful conduct is both "intentional or reckless" and "extreme and outrageous," that there is "a causal connection between the wrongful conduct and the emotional distress," and that the emotional distress is "severe." *Biven Software, Inc. v. Newman*, 473 S.E.2d 527, 529 (Ga. Ct. App. 1996) (internal quotation marks omitted). The wrongful conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (internal quotation marks omitted). "Conduct is not

15

extreme and outrageous simply because it is unkind or causes someone's feelings to be hurt." *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1229 (11th Cir. 1993) (citing *Peoples v. Guthrie*, 404 S.E.2d 442, 444 (Ga. Ct. App. 1991)). As a general rule, an employer's termination of an employee does not qualify as extreme and outrageous conduct under Georgia law. *Id.*

Swint argues that the officials' alleged conduct—demoting her after she reported the rape allegation and terminating her employment after she refused to sign a letter relinquishing her First Amendment rights—was both intentional and outrageous. During her deposition, she testified that she was specifically upset by Maierhofer reading the letter during the meeting, Ivey attending the meeting, and Pullen and Grizzard accusing her of meddling in the affairs of the Cultural Arts Center. She alleges that as a result of the emotional distress the officials caused her, she now suffers from heart issues and anxiety, for which she takes medication.

We agree with the district court that the officials' conduct was neither "intentional or reckless" nor "extreme and outrageous." *Biven Software*, 473 S.E.2d at 529. None of the actions that Swint identified, nor the requirement that she sign to acknowledge that she received a letter and understood its conditions, is conduct that "go[es] beyond all possible bounds of decency" or is "atrocious[] and utterly intolerable in a civilized community." *Id.* (internal quotation marks omitted). The opinions that Swint cites in support of her claim are inapposite

16

because they involve sexual harassment, unfair treatment compared to other employees, failure to compensate for overtime, *Trimble v. Circuit City Stores, Inc.*, 469 S.E.2d 776, 777–78 (Ga. Ct. App. 1996), and demotion and threatened termination for testifying against an employer, *Yarbray v. S. Bell Tel. & Tel. Co.*, 409 S.E.2d 835, 836, 838 (Ga. 1991). Reading a letter with employment conditions is not comparable. Moreover, Swint acknowledged in her deposition that the officials did not intend to cause her to hyperventilate or to have a panic attack. She cannot prevail on her claim that they intentionally or recklessly caused her severe emotional distress.

## IV. CONCLUSION

We **AFFIRM** the summary judgment in favor of the city and its officials.