[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-14682

_____

D.C. Docket No. 2:16-cv-14162-RLR


JAMES P. CROCKER,

                                                            Plaintiff - Appellant,

versus

DEPUTY SHERIFF STEVEN ERIC BEATTY,
Martin County Sheriff's Office, in his individual capacity,

                                                            Defendant - Appellee.


_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(April 20, 2021)

Before MARTIN, NEWSOM, and JULIE CARNES, Circuit Judges.

NEWSOM, Circuit Judge:

When Deputy Sheriff Steven Beatty arrived at the scene of a fatal car crash on I-95 in south Florida, he saw James Crocker standing in the median taking photos of the accident with his phone. Beatty seized Crocker's phone and told him to drive away. When Crocker refused to leave without his phone, Beatty arrested him and left him in a hot patrol car for about 30 minutes. Crocker sued, alleging that Beatty violated his rights under the First, Fourth, and Fourteenth Amendments and Florida law. The district court granted Beatty summary judgment on all of Crocker's claims save one, on which Crocker later prevailed at trial. Crocker now appeals the district court's order.

We affirm. In particular, we hold (1) that Crocker's First Amendment claim is barred by qualified immunity, (2) that his false-arrest claims fail because Beatty had probable cause to arrest him, and (3) that his excessive-force claim fails on the merits and, in any event, is barred by qualified immunity.

**I**

**A**

Facts first.[1] James Crocker was driving north on I-95 through Florida when he saw an overturned vehicle in the median. Crocker pulled over to the shoulder and got out of his car to see if he could help. Ten to fifteen other people did the

---

[1] Because we are reviewing the district court's order granting Beatty summary judgment, we take the facts in the light most favorable to Crocker. *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007). As appropriate, we will note where Beatty's account diverges from Crocker's.

2

same.  As law-enforcement and emergency personnel began to arrive, Crocker and the other onlookers moved away.  Crocker then stood 40–50 feet from the accident scene and about 125 feet from his own vehicle.  Crocker and other bystanders took pictures of the scene with their phones.

Martin County Deputy Sheriff Steven Beatty approached Crocker and confiscated his phone—Crocker says "without warning or explanation."  When Crocker asked whether it was illegal to photograph the accident scene, Beatty replied: "[N]o, but now your phone is evidence of the State."  Beatty instructed Crocker to drive to a nearby weigh station to wait.  Crocker didn't leave; instead, he offered to delete the pictures from his phone.  Beatty again told Crocker to go to the weigh station and that someone from the Florida Highway Patrol would follow up with him about his phone.  Crocker again refused, telling Beatty: "I've been a law-abiding citizen of this town for 20 something years, [and] I deserve to be treated with dignity and respect."

At that point, Beatty informed Crocker that he was under arrest for resisting an officer.  Crocker then offered to leave—but, he said, not without his phone. Beatty handcuffed Crocker and escorted him toward his patrol car.  Along the way, Crocker told Beatty: "[S]ir, I've been personal friends with [Sheriff] Will Snyder over 25 years, I employ over a hundred people in this town, [and] I've never broken the law."  Beatty responded: "I don't care who you know or how many

3

people you employ, you're going to jail." After placing Crocker in the patrol car, Beatty turned off the air conditioning.[2] Outside, it was about 84° Fahrenheit,[3] and inside the patrol car, Crocker became hot and uncomfortable. He sweated profusely, experienced some trouble breathing, and felt anxious. Beatty left Crocker for a short while, and when he returned to the car Crocker begged for air and said he was "about to die." Beatty responded, "[I]t's not meant to be comfortable sir," and left Crocker where he was.

Sometime later, a Florida Highway Patrol trooper came by, opened the car's door, and asked Crocker for his driver's license. Crocker pleaded with her for help, too. Shortly thereafter, Crocker says, the trooper spoke to Beatty, who returned to the car and turned the AC back on.

In total, Crocker was left in the hot patrol car for somewhere between 22 and 30 minutes, after which Beatty drove him to the local jail. County officials eventually released Crocker, returned his phone to him, and dropped the "resisting

---

[2] Beatty denies turning the AC off or down.

[3] The district court took judicial notice of this fact. Although "the taking of judicial notice of facts is, as a matter of evidence law, a highly limited process," we've observed that "scientific facts" are among "the kinds of things about which courts ordinarily take judicial notice." *Shahar v. Bowers*, 120 F.3d 211, 214 (11th Cir. 1997) (en banc). The temperature outside on a given day qualifies.

an officer" charge.  Crocker didn't seek any medical attention in the aftermath of his arrest.[4]

## B

Crocker sued Beatty and Martin County Sheriff William Snyder under 42 U.S.C. § 1983.  As relevant here, Crocker alleged violations of his rights under the First, Fourth, and Fourteenth Amendments on the grounds that Beatty (1) prevented him from taking photographs of government officials, (2) seized his phone and falsely arrested him, and (3) used excessive force during the arrest. Crocker separately challenged his arrest under Florida law.

The district court granted Snyder's motion for summary judgment in its entirety and granted Beatty's motion on qualified-immunity grounds with respect to all of Crocker's claims except the one alleging that his phone was seized in violation of the Fourth Amendment.  Crocker filed a motion for reconsideration, which the court denied.

---

[4] Although Crocker submitted an expert report stating that he suffered severe contusions as a result of being handcuffed by Beatty, the district court excluded that report because (1) it came four years after Crocker's arrest, (2) it contradicted Crocker's own testimony that he suffered no visible injuries from being handcuffed, (3) it ignored other significant contributing factors to Crocker's condition, like his pre-existing carpal-tunnel syndrome, and (4) the doctor who authored the report purporting to link Crocker's wrist problems to his arrest didn't know that Crocker had been arrested (and handcuffed) again only weeks after this incident.  Crocker doesn't challenge the exclusion of this expert report on appeal.

Beatty filed an interlocutory appeal of the district court's order denying him qualified immunity on the phone-seizure claim, but this Court affirmed. *Crocker v. Beatty*, 886 F.3d 1132, 1138 (11th Cir. 2018). Crocker prevailed on that claim at trial, and the jury awarded him $1,000 in damages.

Crocker then appealed the district court's summary judgment order granting Beatty qualified immunity on the First Amendment, false-arrest, and excessive-force claims, which became final when judgment was entered following the jury verdict. This is Crocker's appeal.

## II

Before us, Crocker presents three issues. He contends that the district court shouldn't have granted summary judgment to Beatty on (1) his First Amendment claim, (2) his Fourth Amendment and state-law false-arrest claims, or (3) his Fourteenth Amendment excessive-force claim. Because the district court rejected each claim on qualified-immunity grounds, we will begin with an overview of how qualified immunity works.[5]

## A

Qualified immunity "shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of

---

[5] This Court "review[s] a district court's grant or denial of a motion for summary judgment *de novo.*" *Harris v. Bd. of Educ. of the City of Atlanta*, 105 F.3d 591, 595 (11th Cir. 1997) (per

which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  When qualified immunity applies, it is "an *immunity from suit* rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  The doctrine shields "all but the plainly incompetent or those who knowingly violate the law." *Gates v. Khokhar*, 884 F.3d 1290, 1296 (11th Cir. 2018) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).

"To receive qualified immunity, the officer must first show that he acted within his discretionary authority." *Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1291 (11th Cir. 2009).  It's undisputed here that Beatty was acting within his discretionary authority, so it falls to Crocker to "show that qualified immunity should not apply." *Id.*  To do so, Crocker must allege facts establishing both (1) that Beatty violated a constitutional right and (2) that the relevant right was "clearly established" at the time of the alleged misconduct. *Jacoby v. Baldwin Cnty.*, 835 F.3d 1338, 1344 (11th Cir. 2016).  We can affirm a grant of qualified immunity by addressing either prong or both. *Pearson*, 555 U.S. at 236.

---

curiam) (quotation marks omitted).  Whether a public official is entitled to qualified immunity is "a purely legal question, subject to *de novo* review." *Id.*  "Summary judgment is appropriate where 'there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law.'" *Skop*, 485 F.3d at 1136 (quoting Fed. R. Civ. P. 56(c)).  We view the facts "in the light most favorable to the non-moving party." *Id.* (quotation marks omitted).  "We may affirm the judgment below on any ground supported by the record, regardless of whether it was relied on by the district court." *Statton v. Fla. Fed. Jud. Nominating Comm'n*, 959 F.3d 1061, 1065 (11th Cir. 2020).

On the second prong, only decisions of the United States Supreme Court, this Court, or the highest court in a state can "clearly establish" the law. *Gates*, 884 F.3d at 1296. Because only clearly established law gives an officer "fair notice that her conduct was unlawful," *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004), the Supreme Court has held that the contours of the constitutional right at issue "must be sufficiently clear [so] that a reasonable official would understand that what he is doing violates that right," *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quotation marks omitted).

Under this Court's precedent, a right can be clearly established in one of three ways. Crocker must point to either (1) "case law with indistinguishable facts," (2) "a broad statement of principle within the Constitution, statute, or case law," or (3) "conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Lewis*, 561 F.3d at 1291–92. Although we have recognized that options two and three can suffice, the Supreme Court has warned us not to "define clearly established law at a high level of generality." *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014) (quotation marks omitted). For that reason, the second and third paths are rarely-trod ones. *See Gaines v. Wardynski*, 871 F.3d 1203, 1209 (11th Cir. 2017) (collecting cases). And when a plaintiff relies on a "general rule[ ]" to show that the law is clearly established, it must "appl[y] with *obvious clarity* to the

8

circumstances." *Long v. Slaton*, 508 F.3d 576, 584 (11th Cir. 2007) (quotation marks omitted; emphasis added); *see also Youmans v. Gagnon*, 626 F.3d 557, 563 (11th Cir. 2010) ("[I]f a plaintiff relies on a general rule, it must be obvious that the general rule applies to the specific situation in question.").

With that background, we turn to Crocker's claims.

## B

## 1

We begin with Crocker's First Amendment claim. The district court held that Beatty was entitled to qualified immunity because the law underlying Crocker's First Amendment claim wasn't clearly established. We agree.

Crocker's contrary argument appears to be of the Path-2 variety—*i.e.*, a contention that a "broad statement of [First Amendment] principle" in our caselaw clearly established his right to photograph the accident scene. For that proposition, he first points to our three-paragraph opinion in *Smith v. City of Cumming*, 212 F.3d 1332 (11th Cir. 2000). There, we said that "[t]he First Amendment protects the right to gather information about what public officials do on public property, and specifically, a right to record matters of public interest." 212 F.3d at 1333. In particular, we held that the plaintiffs there "had a First Amendment right, subject to

9

reasonable time, manner and place restrictions, to photograph or videotape police conduct." *Id.* So far, so good—that's certainly a "broad statement."

But in our view, it is decidedly *not* "obvious" that *Smith*'s "general rule applies to the specific situation in question" here. *Youmans*, 626 F.3d 557 at 563. To borrow the district court's phrasing, Crocker was "spectating on the median of a major highway at the rapidly evolving scene of a fatal crash." In that "specific situation," we don't think it would be obvious to every reasonable officer that *Smith* gave Crocker the right to take pictures of the accident's aftermath. *Smith*'s declaration of a right to record police conduct came without much explanation; as the Third Circuit has pointed out, our opinion "provided few details regarding the facts of the case, making it difficult to determine the context of the First Amendment right it recognized." *Kelly v. Borough of Carlisle*, 622 F.3d 248, 260 (3d Cir. 2010). What's more, *Smith* went on to hold that "[a]lthough the [plaintiffs there] ha[d] a right to videotape police activities, they ha[d] not shown that the Defendants' actions violated that right." 212 F.3d at 1333. The dearth of detail about the contours of the right announced in *Smith* undermines any claim that it provides officers "fair warning" under other circumstances.[6] And that's especially

---

[6] None of the other cases that Crocker cites help his cause. *Childs v. Dekalb County*, 286 F. App'x 687 (11th Cir. 2008), and *Bowens v. Superintendent of Miami South Beach Police Department*, 557 F. App'x 857 (11th Cir. 2014), don't do the trick because "[u]npublished cases . . . do not serve as binding precedent and cannot be relied upon to define clearly established law." *J W by & through Tammy Williams v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1260 n.1

so here, given the chaos of a fatal car crash and a citizen who (as we will explain shortly) might well have been photographing the incident from an unlawful vantage point.

The dissent concludes otherwise on the ground that "the broad pronouncement in *Smith* underscores the right's general applicability." Dissenting Op. at 53. And so, as the dissent reads *Smith*, the "right to record police activity" may be "limited only by 'reasonable time, manner and place restrictions.'" Dissenting Op. at 53–4 (quoting *Smith*, 212 F.3d at 1333). Because the dissent finds no such restrictions in the record here, it would "hold that Mr. Crocker's First Amendment right to record the fatal car crash was clearly established" by *Smith*. Dissenting Op. at 56.

A couple of responses. First, there is the Supreme Court's oft-repeated instruction "not to define clearly established law at a high level of generality." *Ashcroft*, 563 U.S. at 742. With that negative injunction comes a positive command to ask "whether the violative nature of *particular* conduct is clearly established." *Mullenix*, 577 at 12 (quotation marks omitted). And we must answer

---

(11th Cir. 2018) (citation omitted). (*Bowens* is doubly deficient; not only is it unpublished, but it was also decided in 2014, two years *after* the events underlying this case. *See Brosseau*, 543 U.S. at 200 n.4 (decisions that postdate alleged misconduct can't clearly establish the law).) The various district court decisions that Crocker cites fare no better, as they likewise can't clearly establish the law. *See D'Aguanno v. Gallagher*, 50 F.3d 877, 880 n.5 (11th Cir. 1995); *see also Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case." (quotation marks and citation omitted)).

that question "in light of the specific context of the case, not as a broad general proposition." *Brosseau*, 543 U.S. at 198 (quotation marks omitted). Given that guidance, it seems to us that *Smith*'s lack of explanation remains more vice than virtue for the purpose of clearly establishing the law here.

Second, we think that one of the few contextual clues *Smith* did leave behind counsels against reading it to have clearly established the law for the purposes of this case. Specifically, *Smith*'s reference to "reasonable time, manner and place restrictions" (which the dissent echoes) calls to mind either "a traditional public forum—parks, streets, sidewalks, and the like"—or a "designated public forum"—*i.e.*, a place made a public forum by government action. *Minnesota Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018) (explaining that time, place, and manner restrictions may govern speech in those public forums). *Smith*'s allusion to these restrictions indicates that the plaintiffs there attempted to film police activity while in a public forum of some sort—*Smith* would seem to be a First Amendment anomaly otherwise. Needless to say, I-95's median isn't a public forum of any stripe. It's not clear to us, then, that *Smith*'s (and the dissent's) time-place-and-manner gloss even applies here.[7]

---

[7] The dissent notes that time, place, and manner restrictions can be imposed in places other than public forums. Dissenting Op. at 54 n.2. That's true. But what makes *Smith*'s reference to those restrictions telling is that the Court there said that *only* those restrictions could be imposed on the right that it announced. *See Smith*, 212 F.3d at 1333. We know that in nonpublic forums, "the government has much more flexibility to craft rules limiting speech." *Minnesota Voters All. v.*

To be clear, though, the question isn't whether *Smith* might imply to *us* some kind of public-forum predicate; rather, we must ask whether *every reasonable police officer in Beatty's position* would have known that Crocker had a right to record the accident's aftermath, subject only to reasonable time, place, and manner restrictions. *See Ashcroft*, 563 U.S. at 741; *Gates*, 884 F.3d at 1303 ("[T]he test asks whether already existing law was so clear that, given the specific facts facing this particular officer, one must conclude that every reasonable official would have understood that what he is doing violates the Constitutional right at issue." (quotation marks omitted)). We don't think so. Subject to exceptions not relevant here, Florida law prohibits individuals from parking on the side of a "limited access facility" like I-95, Fla. Stat. § 316.1945(1)(a)(11), or walking on the same,

_____

*Mansky*, 138 S. Ct. 1876, 1885 (2018); *see also id.* at 1885–86 (noting that "the government may impose some content-based restrictions on speech in nonpublic forums, including restrictions that exclude political advocates and forms of political advocacy"). So, given that *Smith* said that the only possible restrictions on the right that it recognized were time, place, and manner restrictions, one can reasonably infer that the Court there recognized a right to record police conduct in public forums.

The dissent also suggests that all this public-forums talk is beside the point because *Smith* held that there's a First Amendment "right to gather information about what public officials do on *public property*." 212 F.3d at 1333 (emphasis added). Accordingly, on the dissent's view, *Smith* grants citizens the right to film police "in public," full-stop. Dissenting Op. at 54 n.2. We don't think it's quite that simple. First, not all "public property" is "in public," per se, and second, even public property that is decidedly in public doesn't, by virtue of that fact alone, become a free-speech-friendly zone. *See, e.g.*, *United States v. Grace*, 461 U.S. 171, 177 (1983) ("Publicly owned or operated property does not become a 'public forum' simply because members of the public are permitted to come and go at will."); *Hodge v. Talkin*, 799 F.3d 1145, 1160 (D.C. Cir. 2015) ("[T]he Supreme Court plaza's status as a nonpublic forum is unaffected by the public's unrestricted access to the plaza at virtually any time."). Those background principles, we think, counsel against reading *Smith* too aggressively, or, more relevantly, expecting every reasonable officer to do so.

13

*see id.* § 316.130(18). When Beatty seized his phone, Crocker was arguably in violation of both prohibitions. The dissent's *Smith*-based argument implies that, in addition to banning individuals from parking or walking on interstates, Florida must also craft separate time, place, and manner restrictions governing the speech of people who break those laws. That seems odd to us—and at the very least not obviously correct. The Supreme Court has long held that "[t]he State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." *Greer v. Spock*, 424 U.S. 828, 836 (1976) (quotation marks omitted). And more to the point, we don't think that it would have been obviously right to every reasonable officer in Beatty's position. *See Ashcroft*, 563 U.S. at 741; *Gates*, 884 F.3d at 1303.[8]

---

[8] One more thing: By its terms, *Smith* applies only to what the Court there called the right to "photograph or videotape police conduct." 212 F.3d at 1333. The dissent claims that "it is usually easy enough to know whether a plaintiff was recording police activity" and that here, Crocker "was photographing police conduct." Dissenting Op. at 54. To the extent that the general proposition builds on the case-specific point, we're dubious. In his affidavit, Crocker said that he stood in the median "taking photographs and recording video . . . of the crashed vehicle, the first responders and the jaws of life." Asked in his deposition, "What were you taking pictures of?" Crocker replied, "The overall scene, overturned vehicle, firemen." And when asked if he had "a specific reason" for taking pictures of the accident scene, Crocker said: "I really didn't have a clear and present agenda. I do remember seeing beer bottles laying there and I do remember photographing the beer bottles." On the district court's account, Crocker had just started "photographing the overall scene, which included empty beer bottles, the overturned vehicle, and firemen" when, less than 30 seconds later, he encountered Beatty. Even if, for purposes of our review, we were to grant that Crocker's references to "first responders" and "firemen" included police officers, we don't think it's always as easy as the dissent suggests for an officer acting in the heat of the moment to determine whether an onlooker is in fact "photograph[ing] or videotap[ing] police conduct" within the meaning of *Smith*.

For the foregoing reasons, we hold that *Smith*'s rule didn't apply with "obvious clarity to the circumstances," *Long*, 508 F.3d at 584, and, therefore, that Beatty is entitled to qualified immunity on Crocker's First Amendment claim.

**2**

We turn next to Crocker's two false-arrest claims, the first of which arises under the Fourth Amendment, and the second of which rests on Florida law.

**a**

On Crocker's Fourth Amendment claim, Beatty is entitled to qualified immunity because he didn't violate Crocker's constitutional rights.[9]

The Fourth Amendment protects individuals "against unreasonable searches and seizures." U.S. Const. amend. IV. An arrest constitutes a "seizure" within the meaning of the Fourth Amendment, and this Court "assess[es] the reasonableness of an arrest by the presence of probable cause for the arrest." *Carter v. Butts Cnty.*, 821 F.3d 1310, 1319 (11th Cir. 2016). The existence of probable cause bars a Fourth Amendment false-arrest claim. *Marx v. Gumbinner*, 905 F.2d 1503, 1505–06 (11th Cir. 1990).

---

[9] Although we often proceed straight to the clearly-established question to avoid making an unnecessary pronouncement of constitutional law, here we exercise our discretion to reach the constitutional question in order to conserve judicial resources. *See Pearson*, 555 U.S. at 236. As we explain in text, the existence of probable cause dooms both of Crocker's false-arrest claims, and accordingly, we think it sensible to "avoid avoidance." *Camreta*, 563 U.S. at 706.

15

A few probable-cause basics:  An officer has probable cause when "the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense."  *Williamson v. Mills*, 65 F.3d 155, 158 (11th Cir. 1995) (quotation marks omitted).  Moreover, "[t]he validity of an arrest does not turn on the offense announced by the officer at the time of the arrest."  *Bailey v. Bd. of Cnty. Comm'rs of Alachua Cnty.*, 956 F.2d 1112, 1119 n.4 (11th Cir. 1992).  Finally, an officer's subjective intent doesn't matter for "ordinary, probable-cause Fourth Amendment analysis."  *Whren v. United States*, 517 U.S. 806, 813 (1996).

As to Crocker's Fourth Amendment claim, the district court held that Beatty was shielded by qualified immunity because he had probable cause to arrest Crocker for violating Florida Statute § 316.1945(1)(a)(11).  That provision prohibits (in relevant part) stopping, standing, or parking a vehicle "[o]n the roadway or shoulder of a limited access facility."[10]  There's a carveout for Good Samaritans, such that the prohibition doesn't apply to "a person stopping a vehicle to render aid to an injured person or assistance to a disabled vehicle in obedience to the directions of a law enforcement officer."  *Id.*  Florida law authorizes an officer

---

[10] A limited-access facility is a "street or highway especially designed for through traffic and over, from, or to which owners or occupants of abutting land or other persons have no right or easement, or only a limited right or easement."  2010 Fla. Stat. § 316.003(19).

to conduct a warrantless arrest for any violation of § 316 committed in his presence. *Id.* § 901.15(5).

Because Crocker's car was parked on the shoulder of I-95, a "limited access facility," the district court held that Beatty had probable cause to arrest him. And although Crocker might initially have been covered by the Good Samaritan exception, the court held that he no longer qualified by the time he encountered Beatty, at which point he was standing 40–50 feet away from the crash scene and merely observing it.

We agree with the district court that Officer Beatty had probable cause to arrest Crocker. Even under Crocker's own version of the arrest, "the facts and circumstances within [Beatty's] knowledge" could have "cause[d] a prudent person to believe," *Williamson*, 65 F.3d at 158, that Crocker was violating § 316.1945(1)(a)(11). No one disputes that Crocker pulled over and parked on the shoulder of a limited-access facility or that the arrest took place about 125 feet from Crocker's car. And the district court took judicial notice of the fact—which we have no reason to doubt—that this particular stretch of I-95 is "relatively flat," and then concluded, in the light of that fact, that it would be unreasonable to infer that Beatty was oblivious to Crocker's car's existence.

Crocker insists, however, that there's no evidence that Beatty knew that Crocker had *driven* to the scene and that Beatty therefore couldn't formulate

17

probable cause to arrest him for the *parking* offense.  But Crocker's own testimony, which we accept as true, defeats his argument.  Crocker testified that during their brief encounter before the arrest, Beatty "told [him] *to leave and drive* to the northbound weigh station and wait there"—to which Crocker responded that he'd be more than happy to cooperate.  Crocker also testified that "[Beatty] told me to *get in my car* and drive to the northbound . . . weigh station."  That testimony—both Beatty's commands and Crocker's responses—would have made little sense if Crocker was a mere pedestrian.

All of that is to say that the facts within Beatty's knowledge could "cause a prudent person to believe," *Williamson*, 65 F.3d at 158, that Crocker's car was parked on a limited-access facility in violation of Florida law.  And at the time of the arrest, Crocker was just taking pictures with his phone—not rendering aid—meaning that he no longer even arguably qualified for the statute's Good Samaritan exception.  Because Beatty had probable cause to arrest Crocker, there was no constitutional violation, and Beatty is entitled to qualified immunity.

**b**

On, then, to the state-law false-arrest claim.  Probable cause bars a claim for false arrest under Florida law just as it does under federal law.  *Manners v. Cannella*, 891 F.3d 959, 975 (11th Cir. 2018); *see also Rankin v. Evans*, 133 F.3d 1425, 1435 (11th Cir. 1998) (recognizing that "probable cause constitutes an

18

absolute bar to both state and § 1983 claims alleging false arrest" and that "the standard for determining whether probable cause exists is the same under Florida and federal law").  Because we hold that Beatty had probable cause to arrest, Crocker's Florida false-arrest claim—like his Fourth Amendment claim—fails.

Crocker counters that even if his arrest didn't violate the Fourth Amendment, it violated state law because the governing Florida statute requires the offense at issue to occur "in the presence of the officer"—and here, Crocker contends, the offense didn't occur in Beatty's presence.  *See* Fla. Stat. § 901.15(5). For support, Crocker points out that Florida "courts have strictly construed the 'presence of the officer' language, requiring that the arresting officer actually see or otherwise detect by his senses that the person has violated the ordinance." *Horsley v. State*, 734 So. 2d 525, 526 (Fla. Dist. Ct. App. 1999).

No matter how strictly we construe it, though, the presence-of-the-officer requirement was met here.  Again, the relevant rule of Florida law is that "no person shall . . . [s]top, stand, or park a vehicle" on the "shoulder of a limited access facility."  Fla. Stat. § 316.1945(1)(a)(11).  From the premise—already explained—that Beatty could see that Crocker had parked on the shoulder of I-95, it follows that the offense was committed in Beatty's presence.  Because Beatty had probable cause to arrest Crocker for an offense committed in his presence, the district court was right to give him summary judgment on this claim too.

19

**3**

Finally, to Crocker's argument that Beatty used excessive force in violation of the Fourteenth Amendment by detaining him in a hot patrol car.[11]  "We begin from the premises that exposure to uncomfortable heat is part and parcel of life in the South and, accordingly, that not every 'hot car' case will give rise to a cognizable constitutional claim."  *Patel v. Lanier Cnty.*, 969 F.3d 1173, 1178 (11th Cir. 2020).  This one doesn't.  Explaining why takes some doing.

First, we'll survey the excessive-force landscape.  Second, we'll situate Crocker's claim within it.  And finally, we'll explain why the district court's grant of summary judgment was right even though its analysis was wrong.  Because we review a court's judgment rather than its explanation for that judgment, *Jennings v. Stephens*, 574 U.S. 271, 277 (2015), we will affirm.

**a**

Let's start with what's clear:  There is no "generic 'right' to be free from excessive force."  *Graham v. Connor*, 490 U.S. 386, 393 (1989).  That's because § 1983 protects rights—it doesn't create them.  *Id.* at 393–94; *see also Baker v. McCollan*, 443 U.S. 137, 145 n.3 (1979) (explaining that § 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere

---

[11] Although Crocker argued in the district court that Beatty also used excessive force in tightening his handcuffs and squeezing a pressure point on his shoulder, he hasn't pursued those arguments on appeal.

conferred"). For purposes of claims under § 1983, three constitutional provisions protect a right to be free from excessive force: the Fourth, Eighth, and Fourteenth Amendments. *Piazza v. Jefferson Cnty.*, 923 F.3d 947, 952 (11th Cir. 2019).

The Fourth Amendment, already introduced, secures "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. The prohibition against "unreasonable . . . seizures" encompasses a bar on the use of excessive force in the course of an arrest. *See Graham*, 490 U.S. at 394; *Piazza*, 923 F.3d at 952. The Eighth Amendment forbids the infliction of "cruel and unusual punishments," U.S. Const. amend. VIII, and the Supreme Court has interpreted it to prohibit the use of excessive force against convicted prisoners. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992). The Fourteenth Amendment provides that a State shall not "deprive any person of life, liberty, or property, without due process of law," U.S. Const. amend. XIV, and the Court has construed those terms to forbid the use of excessive force, too. *See Kingsley v. Hendrickson*, 576 U.S. 389, 393 (2015). So, under the Supreme Court's current framework, the Fourth Amendment covers arrestees, the Eighth Amendment covers prisoners, and the Fourteenth Amendment covers "those who exist in the in-between—pretrial detainees." *Piazza*, 923 F.3d at 952.

With that background in mind, we turn to Crocker's claim.

21

**b**

The Supreme Court has long taught that "[i]n addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham*, 490 U.S. at 394; *accord, e.g.*, *Paez v. Mulvey*, 915 F.3d 1276, 1285 (11th Cir. 2019). So, exactly what kind of excessive-force claim has Crocker alleged?

Not entirely clear. Crocker's filings before the district court could be read as raising either a Fourth Amendment claim, a Fourteenth Amendment claim, or perhaps both.[12] But Crocker's counsel later clarified that his hot-car excessive-force claim relied *solely* on the Fourteenth Amendment. And in his opening brief to this Court, Crocker expressly cast his claim in Fourteenth Amendment terms.

But as you might suspect from Crocker's shape-shifting arguments, the Fourteenth Amendment doesn't offer a perfect fit for the facts here. As we said in *Piazza*, the Fourteenth Amendment has been interpreted to protect "pretrial detainees" from excessive force. *See* 923 F.3d at 952. And it's not obvious that Crocker was a pretrial detainee. The Supreme Court long ago described a pretrial

---

[12] In his complaint, Crocker's excessive-force claims against Beatty weren't expressly tethered to any particular constitutional provision. He generally alleged that Beatty violated his Fourth, Eighth, and Fourteenth Amendment rights, but he didn't specify which amendments were tied to particular excessive-force allegations. In response to the motion for summary judgment, Crocker explicitly relied on the Fourth Amendment, and he cited *Graham* repeatedly for propositions about the Fourth Amendment right to be free from excessive force. But he also alluded to the Fourteenth Amendment. All of that is to say that the precise nature of Crocker's excessive-force claim is hard to nail down from his district-court pleadings.

22

detainee as a person who had received "a 'judicial determination of probable cause as a prerequisite to [the] extended restraint of [his] liberty following arrest.'" *Bell v. Wolfish*, 441 U.S. 520, 536 (1979) (quoting *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975)) (alterations in original).  Because Crocker never made it to the probable-cause-determination stage, calling him a "pretrial detainee" is hard to square with *Bell*.  Accordingly, it's not clear that the Fourteenth Amendment provides the appropriate framework for Crocker's excessive-force claim.

*Bell*'s suggestion notwithstanding, we've acknowledged that "the line is not always clear as to when an arrest ends and pretrial detainment begins."  *Garrett v. Athens-Clarke Cnty.*, 378 F.3d 1274, 1279 n.11 (11th Cir. 2004).  As a result, the line—for excessive-force purposes—between an arrestee and a pretrial detainee isn't always clear, either.  *See Hicks v. Moore*, 422 F.3d 1246, 1254 n.7 (11th Cir. 2005) ("The precise point at which a seizure ends (for purposes of Fourth Amendment coverage) and at which pretrial detention begins (governed until a conviction by the Fourteenth Amendment) is not settled in this Circuit.").  And the definitional problem creates a follow-on analytical issue:  For someone who could plausibly be characterized as either an arrestee or a pretrial detainee, it's hard to

23

say whether the Fourth or Fourteenth Amendment should govern the analysis.[13]
The day may well come when we need to clarify the distinction.

Today, though, isn't that day.  Whether framed in terms of the Fourth or
Fourteenth Amendment, Crocker's claim fails.[14]

## c

We will start with the Fourteenth Amendment analysis since that's the
framework that Crocker has invoked before us.  First, we'll articulate the
governing standard—which the district court misapprehended and our dissenting
colleague disputes—and then, having done so, we'll apply that standard to
Crocker's case.

## i

We recently laid out the proper Fourteenth Amendment excessive-force
framework and applied it in a "hot car" case in *Patel*.  There, we began by

---

[13] Our sister circuits disagree about how best to analyze claims that arise in this "legal twilight zone."  *See Wilson v. Spain*, 209 F.3d 713, 715 & n.2 (8th Cir. 2000) (discussing circuit split and collecting cases).

[14] The dissent says that the question whether the Fourth or Fourteenth Amendment should govern our analysis is "a question the majority opinion injects into this case."  Dissenting Op. at 56.  But in his brief to us, Beatty argued—no doubt in response to Crocker's own variable framing of the issue—that "[r]egardless of whether the Fourth or Fourteenth Amendment standard were applied to this case, the use of force did not violate the Constitution," Br. of Appellee at 23, and as part of his argument that "*Kingsley* does not clearly establish the rights of an arrestee before arriving at a detention center," he contended that the law "did not define when the Fourth Amendment ceases to apply and the Fourteenth Amendment begins to apply," *id.* at 25.  We took all that to mean that one of Beatty's points was that Crocker's claim might fall on the "wrong" side of an (admittedly) ill-defined line between Fourth and Fourteenth Amendment claims, such that *Kingsley*, as a Fourteenth Amendment case, didn't help Crocker's cause.

explaining that claims of excessive force under the Fourteenth Amendment *used to be* analyzed like excessive-force claims under the Eighth Amendment, such that we had to undertake a subjective inquiry into whether an officer applied force "maliciously and sadistically." *Patel*, 969 F.3d at 1181 (quoting *Fennell v. Gilstrap*, 559 F.3d 1212, 1217 (11th Cir. 2009)). If so, then there was excessive force. If not, then there wasn't.

Not anymore. In *Kingsley v. Hendrickson*, the Supreme Court held that for Fourteenth Amendment excessive-force claims "the relevant standard is objective not subjective." 576 U.S. at 395. Underscoring the shift, the Court repeated itself: "[T]he appropriate standard for a pretrial detainee's excessive force claim is *solely an objective one*." *Id.* at 397 (emphasis added); *see also Miranda-Rivera v. Toledo-Davila*, 813 F.3d 64, 70 (1st Cir. 2016) ("[T]he Supreme Court has held that the appropriate standard for a pretrial detainee's Fourteenth Amendment excessive force claim is simply objective reasonableness."). So, as we said in *Patel*, our Fourteenth Amendment excessive-force analysis now tracks the Fourth Amendment's "objective-reasonableness" standard rather than the Eighth Amendment's "malicious-and-sadistic standard." 969 F.3d at 1181–82; *see also Piazza*, 923 F.3d at 952 (reading *Kingsley* to require an objective-reasonableness inquiry akin to Fourth Amendment excessive-force analysis). Here, the district

25

court erroneously applied the old malicious-and-sadistic standard and, on that basis, granted summary judgment on Crocker's excessive-force claim.

Before applying *Kingsley*'s "objective not subjective" standard to the facts of Crocker's case, we must say a few words in response to our dissenting colleague's reading of that decision. On the dissent's view, both before and after *Kingsley*, a viable excessive-force claim can be based even on "objectively reasonable force" provided that the officer-defendant acted with a sufficiently sinister state of mind—what the dissent calls "an express intent to punish." Dissenting Op. at 59. That, the dissent says, is because under *Bell v. Wolfish*, 441 U.S. 520 (1979), "pretrial detainees can establish a violation of their Fourteenth Amendment rights by showing that an official inflicted force with an express intent to punish." Dissenting Op. at 62. And, the dissent maintains, *Kingsley* shouldn't be read to have done "away with this method of proving Fourteenth Amendment violations for excessive force claims when it said nothing about having done so." *Id.* at 63. On that theory, both before and after *Kingsley*, "proof of express intent to punish is alone sufficient" to support an excessive-force claim. *Id.*

Several responses. First, while *Kingsley* certainly discusses *Bell*'s subjective standard for punishment, we don't draw from that discussion the dissent's two-track treatment of excessive-force claims. Consider, for instance, how the *Kingsley* Court framed the case: "The question before us is whether, to prove an

26

excessive force claim, a pretrial detainee must show that the officers were *subjectively* aware that their use of force was unreasonable, *or only* that the officers' use of that force was *objectively* unreasonable." 576 U.S. at 391–92 (second emphasis added). As the Court's phrasing indicates, proof of objectively unreasonable force has always been *necessary* to a pretrial detainee's excessive-force claim. *See Piazza*, 923 F.3d at 952 ("Historically, both prisoners and pretrial detainees needed to show *not only* that a jail official deliberately used excessive force, *but also* that the official did so maliciously or sadistically for the very purpose of causing harm." (quotation marks omitted; emphasis added)). Post-*Kingsley*, such proof is sufficient. 576 U.S. at 398. But in becoming sufficient, it didn't cease to be necessary.

Second, we don't think that the dissent's assertion that, as a general matter, unconstitutional "punishment" can be proven based on "an express intent to punish," Dissenting Op. at 62, demonstrates, more particularly, that proof of objectively unreasonable force is unnecessary to an excessive-force claim. Here, we think it important to distinguish between and among punishment and its specific instantiations. We agree, of course, that the Constitution prohibits any "punishment" of pretrial detainees, *see Kingsley*, 576 U.S. at 400, including the "use of excessive force that amounts to punishment," *Graham*, 490 U.S. at 395 n.10. But not all punishment involves excessive force. Indeed, neither *Bell* nor

27

*McMillian v. Johnson*, 88 F.3d 1554 (11th Cir. 1996)—the two cases on which the dissent principally relies—mention "excessive force" at all. Rather, both involved what we've called "conditions-of-confinement" claims. *See*, *e.g.*, *Patel*, 969 F.3d at 1182 n.6. And although the genus "punishment" contains several species, including both excessive-force and conditions-of-confinement claims, the standard by which one might discern the one won't necessarily reveal the other. We don't think, then, that an express intent to punish alone, coupled with an objectively reasonable use of force, can sustain an excessive-force claim.[15]

Third, it would be passing strange if, as the dissent seems to suggest, the excessiveness of an officer's use of force ultimately had nothing to do with the excessiveness of that force but, instead, hinged entirely on proof of an "express intent to punish." Dissenting Op. at 63. Imagine, for instance, that an officer gently and carefully places a suspect in the back of a brand new—and comfy, and temperate—police cruiser, and as he's doing so he growls, "I pray you hate every second of this, you lowlife scum—it's the punishment you deserve." It's

---

[15] We recognize, of course, that *Kingsley* discusses cases involving a subjective intent to punish. 576 U.S. at 398–99. But for reasons explained in text, we haven't—and don't—read *Kingsley* to preserve (or create) the possibility of an excessive-force violation, even in circumstances where the use of force is objectively reasonable, on the ground that some sinister purpose is allegedly afoot. As already explained, the *Kingsley* Court stressed that "the appropriate standard for a pretrial detainee's excessive force claim is *solely an objective one*." *Id.* at 397 (emphasis added). Cases involving the old malicious-or-sadistic standard can be useful as reference points, but that's because proving that force was both objectively unreasonable and malicious or sadistic would "almost invariably be more difficult" than proving only the former—*not* because one could stake a winning claim on proof of the latter alone. *See Piazza*, 923 F.3d at 953 n.7.

28

unfathomable to us that the suspect could make out a viable excessive-force claim on those facts. But that's precisely the upshot of the dissent's twin positions (1) that an excessive-force claim can be based even on "objectively reasonable force" and (2) that "proof of express intent to punish is alone sufficient" to support such a claim. *Id*. at 59, 63. That just can't be the law.

Finally, and in any event, even if one could make an objectively-reasonable-but-nonetheless-excessive-force claim, Crocker didn't make one here. In his opening brief to us, Crocker maintained that "[i]n *Kingsley*, the Court held that *the only issue to be decided in a use of force case* was whether the 'use of that force was objectively unreasonable.'" Br. of Appellant at 35 (quoting *Kingsley*, 576 U.S. at 392 (emphasis added)). In doing so, he relied on Fourth Amendment excessive-force cases as "analogous," pointing to *Kingsley*'s own reliance on *Graham*—the canonical Fourth Amendment *objective*-reasonableness case. *Id.* at 37 n.8. He then asked for remand so that the district court could "apply the proper *Kingsley* standard." *Id.* at 40. None of that, it seems to us, would have alerted Beatty that he needed to respond to an argument about a straight express-intent-to-punish-based excessive-force claim. Accordingly, even if were to conclude that *Kingsley* somehow preserved two separate excessive-force standards for pretrial detainees—one objective, another subjective—we would apply only the objective one here. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 682–83 (11th

29

Cir. 2014) (explaining that an appellant abandons issues not argued in his opening brief).

**ii**

On, then, to this case. Although the district court erroneously invoked the malicious-and-sadistic standard, rather than *Kingsley*'s "objective not subjective" standard, it landed on the right answer. As an initial matter, there was (under the proper framework) no constitutional violation. Moreover, and in any event, even if there had been, the law wasn't so clearly established that Beatty should have known better. We begin with the constitutional question.[16]

Officer Beatty's alleged conduct wasn't objectively unreasonable. The Supreme Court has given us six factors to consider in making a Fourteenth Amendment excessive-force determination, and although the Court cautioned that these factors aren't exhaustive or exclusive, they're sufficient here. *See Kingsley*, 576 U.S. at 397. In the course of applying the factors to Crocker's case, we'll compare and contrast *Patel* in an effort to more clearly demonstrate the objective-reasonableness standard's real-world operation.

---

[16] The Supreme Court has said that "courts should think hard, and then think hard again" before addressing the merits of an underlying constitutional claim as well as whether the law is clearly established. *Camreta*, 563 U.S. at 707. Having done our due diligence, we conclude that addressing the constitutional claim here will "clarify the legal standards governing public officials." *Id.* Paired with *Patel*, this case helps illustrate what kind of conduct does and doesn't cross a constitutional line in the context of hot-car cases.

30

Here are the *Kingsley* factors:

> Considerations such as the following may bear on the reasonableness or unreasonableness of the force used: [1] the relationship between the need for the use of force and the amount of force used; [2] the extent of the plaintiff's injury; [3] any effort made by the officer to temper or to limit the amount of force; [4] the severity of the security problem at issue; [5] the threat reasonably perceived by the officer; and [6] whether the plaintiff was actively resisting.

*Patel*, 969 F.3d at 1182 (quoting *Kingsley*, 576 U.S. at 397) (alterations adopted).

First, we consider the need for force and the amount of force used. In weighing the amount of force used, we consider the severity of the conditions that Crocker endured and how long he endured them. *Patel*, 969 F.3d at 1183. Crocker alleges that it was 84° outside and that he was in the patrol car without AC for half an hour. In *Patel*, the temperature was about the same—85°—but the duration of detention was much longer—two hours. 969 F.3d at 1179 & 1183. So, the amount of force used in *Patel* was far greater.

What about the need? In *Patel*, we noted that about half of the detention was "not just harsh but also unnecessary" because the detainee there could have been held inside an immediately adjacent jail instead of the hot van. *Id.* at 1184. Here, by contrast, there doesn't appear to have been another feasible place for Beatty to detain Crocker. And although Beatty could have cracked a window or left the AC running, failing to do so isn't nearly as troubling as the behavior in *Patel*. Though the need for "force" was slight, the force used was slighter still.

31

Second, we consider the extent of Crocker's injury. We've acknowledged that "resulting injuries can be an indicator, however imperfect, of the severity of the force that caused them." *Patel*, 969 F.3d at 1184. Here, Crocker's lack of injury suggests that the force used was pretty minimal.[17] That's yet another point of contrast with *Patel*, in which the plaintiff's two-hour stint in a hot transport van left him "unconscious, hyperventilating, and with mucus and saliva running from his nose and mouth," and a doctor diagnosed him with "heat exhaustion, heat syncope, and panic attack." *Id.* at 1189. Not so here. Crocker endured some discomfort, to be sure, but he suffered no significant injury and sought no medical attention following his arrest.

Third, we consider any effort made by Beatty to temper or limit the force used. *Id.* at 1184. Beatty returned to the car twice, and although he was rude in his initial exchange with Crocker, on his second trip back he turned the AC back on. In *Patel*, the officer left the detainee in the hot van for nearly an hour when he could have let him wait in an air-conditioned jail. *Id.* And he left the detainee alone for a sizable chunk of the two hours that he was in his van. *Id.* We recognize that Beatty could have done more, but in limiting the time that Crocker

---

[17] To be clear, we're not saying that a lack of significant injury always and everywhere means that the force used was reasonable. *Cf. Lee v. Ferraro*, 284 F.3d 1188, 1200 (11th Cir. 2002) ("[O]bjectively unreasonable force does not become reasonable simply because the fortuity of the circumstances protected the plaintiff from suffering more severe physical harm.").

32

was alone and in eventually turning the AC back on, he did a good deal more than the officer in *Patel*.

As for whether Crocker posed a "security problem" or a "threat," or "actively resist[ed]"—factors four, five, and six—it seems to us that the answer on all accounts is basically no—his vociferous opposition to his arrest notwithstanding.

So, where does all that leave us? Considering all the *Kingsley* factors, it seems most important there was very little "force" used and essentially no harm done. In the Fourteenth Amendment context—and the Fourth as well, for that matter—"[t]here is, of course, a *de minimis* level of imposition with which the Constitution is not concerned." *Bell*, 441 U.S. at 539 n.21 (quotation marks omitted); *see also Graham*, 490 U.S. at 396 ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." (quotation marks and citation omitted)); *Vinyard v. Wilson*, 311 F.3d 1340, 1349 n.13 (11th Cir. 2002) (collecting cases "where force and injury were held to be de minimis and not excessive"). That *de minimis* principle reflects the reality that "[n]ot everything that stinks violates the Constitution." *Hillcrest Property, LLP v. Pasco Cnty.*, 915 F.3d 1292, 1303 (11th Cir. 2019) (Newsom, J., concurring) (cleaned up). And it's hard to imagine how we could find a constitutional violation here without making a federal case of just about every "hot

car" incident in Alabama, Florida, and Georgia, which we (once again) decline to do. *See Patel*, 969 F.3d at 1178; *see also Peterson v. Baker*, 504 F.3d 1331, 1336 (11th Cir. 2007) ("Section 1983 must not be used as a font of tort law to convert state tort claims into federal causes of action." (quotation marks omitted)). Beatty's alleged conduct might have stunk, but it wasn't unconstitutional.

If we harbored any doubts about that conclusion—and we don't—we'd still affirm the grant of summary judgment because the law on this point is not at all clearly established. Until recently, we'd never even "directly confronted a 'hot car' case . . . ." *Patel*, 969 F.3d at 1182. Our one-time paucity of hot-car caselaw makes it tough for Crocker to win. Not even Patel—whose constitutional claim was much stronger—could overcome qualified immunity. *See id.* at 1184–88; *cf. Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) ("Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." (quotation marks omitted)). And frankly, we can't see how Crocker's claim could succeed where Patel's failed.

Crocker says that the clearly established law here comes from our decision in *Danley v. Allen*, 540 F.3d 1298 (11th Cir. 2008). We considered and rejected the analogy between *Danley* and hot-car cases in *Patel*, 969 F.3d at 1186–87, and we do so again today. In *Danley*, a prisoner was pepper-sprayed in a poorly-

34

ventilated cell, and although officials allowed him a brief shower, that proved ineffective—Danley ultimately spent 12 or 13 hours stuck "in pepper-spray vapor in a poorly ventilated cell." *Patel*, 969 F.3d at 1187. The use of force in *Danley* was "altogether different" from the force used in *Patel*. *Id.* So too here.

Like Patel before him, Crocker also points to *Danley*'s citation of *Burchett v. Kiefer*, 310 F.3d 937 (6th Cir. 2002). *Burchett* was another hot-car case, and there, the Sixth Circuit held that confining an arrestee "for three hours in ninety-degree heat with no ventilation violated his Fourth Amendment right against unreasonable seizures." 310 F.3d at 945. To the extent Crocker contends that *Danley*'s citation of *Burchett* made *Burchett* part of our caselaw, we reject that incorporation-by-citation argument just as we did in *Patel*. *See* 969 F.3d at 1187 ("[A] mere citation to an out-of-circuit decision—even with approval, and even with an accompanying factual précis—cannot clearly establish the law for qualified-immunity purposes.").

\* \* \*

Because Crocker's Fourteenth Amendment claim fails on the merits—and because the law underlying that claim wasn't clearly established, in any event—we hold that the district court correctly granted summary judgment for Deputy Beatty.

**d**

One final point for the sake of symmetry: We'd reach the same result if we analyzed this claim under the Fourth Amendment. We have already observed that "the Fourteenth Amendment standard has come to resemble the test that governs excessive-force claims brought by arrestees under the Fourth Amendment." *Piazza*, 923 F.3d at 953. And we've said as much about the hot-car context. *See Patel*, 969 F.3d at 1184 n.7 ("Although many of these 'hot car' cases arose under the Fourth Amendment, the same basic standard applies post-*Kingsley* (as we have explained) to excessive-force claims brought under the Fourteenth Amendment."). We think that Officer Beatty's conduct was objectively reasonable under either standard. Here, as in the Fourteenth Amendment context, the *de minimis* principle applies. *See Nolin v. Isbell*, 207 F.3d 1253, 1257 (11th Cir. 2000) ("[T]he application of de minimis force, without more, will not support a claim for excessive force in violation of the Fourth Amendment.").[18] As a result, this claim falls short whether analyzed under the Fourth or Fourteenth Amendment.

---

[18] We recognize, of course, that "even de minimis force will violate the Fourth Amendment if the officer is not entitled to arrest or detain the suspect." *Reese v. Herbert*, 527 F.3d 1253, 1272 (11th Cir. 2008) (quotation marks omitted). But for reasons already explained, that caveat doesn't apply here.

## III

To sum up:  Because (1) the law on Crocker's First Amendment claim wasn't clearly established, (2) Beatty had probable cause to arrest Crocker, and (3) Beatty didn't use excessive force in the course of arresting Crocker (and the law underlying Crocker's excessive-force claim wasn't clearly established, in any event), Beatty was entitled to qualified immunity.  The district court properly granted summary judgment to him on that basis.

**AFFIRMED.**

NEWSOM, Circuit Judge, concurring:

The main opinion finds it unnecessary to decide whether someone in Crocker's position—*i.e.*, one who has been arrested but has not yet been taken before a magistrate for a probable-cause determination—is (1) an *arrestee* whose excessive-force claim should be analyzed under the Fourth Amendment or instead (2) a *pretrial detainee* whose excessive-force claim should be analyzed under the Fourteenth Amendment. *See* Maj. Op. at 22–24. I write separately to suggest two things: first, that this Court hasn't (to my mind) committed itself to any particular position on that issue, which has generated a circuit split; and second, that if another panel confronts this question, it should draw the line between arrestees and pretrial detainees in accordance with *Bell v. Wolfish*, 441 U.S. 520 (1979), such that the probable-cause determination is the divider.

## I

### A

First, how and why have our sister circuits split? In short, they've divided over the question of where to locate the constitutional prohibition on excessive force as applied to someone in Crocker's position. As the main opinion explains, "§ 1983 protects rights—it doesn't create them." Maj. Op. at 20. That means that a plaintiff bringing an excessive-force claim under § 1983 has to ground it in a particular provision of the Constitution. *See Graham v. Connor*, 490 U.S. 386, 394

38

(1989). For prisoners, that's the Eighth Amendment; for free citizens, it's the Fourth Amendment; and for those "in between"—those who obviously qualify as pretrial detainees—it's the Fourteenth Amendment. *See Piazza v. Jefferson Cnty.*, 923 F.3d 947, 952 (11th Cir. 2019). But what about individuals—like Crocker here—who bring excessive-force claims based on events that occur after the initial act of arrest but before they've received a judicial determination of probable cause? *See, e.g.*, *Calhoun v. Thomas*, 360 F. Supp. 2d 1264, 1272 (M.D. Ala. 2005) (discussing "this post-arrest, pre-custody time period"). Courts have disagreed about whether the Fourth or Fourteenth Amendment governs in this legal limbo. *See, e.g.*, *Miranda-Rivera v. Toledo-Davila*, 813 F.3d 64, 70 (1st Cir. 2016) (collecting cases).

There are at least two fixed points. First, we've been told in no uncertain terms that "*all* claims that law enforcement officials have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Graham*, 490 U.S. at 395. Second, we know that "the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment." *Id.* at 395 n.10 (citing *Bell*, 441 U.S. at 535–39). What, though, to do about someone who might no longer be subject to seizure but isn't yet a post-probable-cause-

determination pretrial detainee?  What constitutional protection against excessive force do people in that situation have?

One answer—offered by exactly zero courts, as best I can tell—is "None." The Seventh Circuit, sketching the argument before rejecting it, put it this way: "[M]aybe the Constitution is not a seamless web, and contains gaps that courts are not authorized to fill either by stretching the Fourth Amendment or by invoking the nebulous and historically much-abused concept of substantive due process." *Wilkins v. May*, 872 F.2d 190, 195 (7th Cir. 1989).[1]  The argument's premise— basically, that the Constitution neither provides every good thing nor prohibits every bad thing—is true enough.  Even so, courts—including the Seventh Circuit—have uniformly rejected the possibility that officers' conduct between an arrest and a probable-cause determination takes place in a constitutional no man's land.[2]

_____

[1] *Wilkins* is an odd case to bring into the Fourth-versus-Fourteenth conversation because the excessive-force allegations there were against FBI agents—brought via a *Bivens* action—and although it spoke of "[t]he due process *clause* of the Fifth and Fourteenth Amendments," it seems clear enough that the court's holding vis-à-vis the FBI agents necessarily concerned the Fifth Amendment.  872 F.2d at 191–92, 195 (emphasis added).  But courts have featured *Wilkins* in this discussion, *see, e.g.*, *Aldini v. Johnson*, 609 F.3d 858, 864 n.6 (6th Cir. 2010) (citing *Wilkins*), and the explanation in *Wilkins* itself certainly implicates the Due Process *Clauses* of both the Fifth and Fourteenth Amendments, *see* 872 F.2d at 195.

[2] One reason courts have rejected this possibility, I imagine, is that the Supreme Court's decisions suggest, if anything, an overlap of protections rather than a gap between them.  For instance, in *Graham*, the Court didn't answer "the question whether the Fourth Amendment continues to provide individuals with protection against the deliberate use of excessive physical force beyond the point at which arrest ends and pretrial detention begins."  490 U.S. at 395 n.10. And the Court noted that after conviction, the Eighth Amendment's Cruel and Unusual

Broadly speaking, courts have done so in two ways. The first involves reading the word "seizure[]" in the Fourth Amendment to extend beyond the initial moment of arrest. The Tenth Circuit, for instance, has recognized that some seizures "may extend beyond arrest up until a probable cause determination." *Estate of Booker v. Gomez*, 745 F.3d 405, 420 (10th Cir. 2014). Other circuits have done much the same. *See, e.g.*, *Aldini v. Johnson*, 609 F.3d 858, 866 (6th Cir. 2010) (establishing "the line between Fourth and Fourteenth Amendment protection at the probable-cause hearing" for those arrested without a warrant); *Pierce v. Multnomah Cnty.*, 76 F.3d 1032, 1043 (9th Cir. 1996) (holding "that the Fourth Amendment sets the applicable constitutional limitations on the treatment of an arrestee detained without a warrant up until the time such arrestee is released or found to be legally in custody based upon probable cause for arrest"); *Powell v. Gardner*, 891 F.2d 1039, 1044 (2d Cir. 1989) ("We think the Fourth Amendment standard probably should be applied at least to the period prior to the time when the person arrested is arraigned or formally charged, and remains in the custody (sole or joint) of the arresting officer.").

---

Punishment Clause provides the constitutional basis for excessive-force claims, making "[a]ny protection that 'substantive due process' affords . . . at best redundant of that provided by the Eighth Amendment." *Id.* (citing *Whitley v. Albers*, 475 U.S. 312, 327 (1986)). Our own decisions likewise suggest some degree of overlap. *Compare J W by & through Tammy Williams v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1259 (11th Cir. 2018) (stating that "the Fourteenth Amendment guards against the use of excessive force against arrestees and pretrial detainees"), *with Piazza*, 923 F.3d at 953 (explaining that the Fourth Amendment protects arrestees from excessive force).

The contrary approach relies on the Fourteenth Amendment's Due Process Clause and concepts of due process that are more (or less) "substantive." In *Orem v. Rephann*, for instance, the Fourth Circuit acknowledged that although "[t]he point at which Fourth Amendment protections end and Fourteenth Amendment protections begin is often murky," an excessive-force claim based on events during post-arrest transport "requires application of the Fourteenth Amendment." 523 F.3d 442, 446 (4th Cir. 2008).

If we're counting noses, it seems fair to say that most circuits to have answered this question have lined up behind the Fourth Amendment. *See Miranda-Rivera*, 813 F.3d at 70 (collecting cases). So what about us—where are we? On the basis of our decision in *Cottrell v. Caldwell*, 85 F.3d 1480 (11th Cir. 1996), some have placed us in the minority camp, lumping us in with those courts that rely on the Fourteenth Amendment to analyze excessive-force claims brought by those whose arrest is complete but who haven't yet been had a probable-cause hearing. *See, e.g.*, *Wilson v. Spain*, 209 F.3d 713, 716 n.2 (8th Cir. 2000). Respectfully, I don't think that either *Cottrell* or our subsequent interpretations of it compel that reading.

First, *Cottrell* itself. That case concerned "the death of Leroy Bush Wilson from positional asphyxia as he was being transported in the back of a police car after his arrest." 85 F.3d at 1483. Our court addressed two claims arising "out of

42

the same facts." *Id.* at 1485. One was a "custodial mistreatment claim," *id*. at 1489, and it was indeed based on a supposed substantive-due-process right, *id.* at 1485. The second was a Fourth Amendment excessive-force claim. *Id.* Our treatment of the first, custodial-mistreatment claim appears to be the one that other courts have read to put us on the minority side of the circuit split. *See, e.g.*, *Miranda-Rivera*, 813 F.3d at 70 (citing *Cottrell*, 85 F.3d at 1490). But it seems to me that a custodial-mistreatment claim is different from an excessive-force claim, even if both might arise out of the same facts. And the question as relevant to the custodial-mistreatment claim in *Cottrell* wasn't whether the Fourth or Fourteenth Amendment might govern, but whether the *Eighth* or Fourteenth did. *See* 85 F.3d at 1490. Because a decision doesn't answer questions that aren't asked, *see Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004), I don't think *Cottrell* definitely resolved the Fourth-versus-Fourteenth issue for claims like Crocker's.

Subsequent decisions from within this circuit support that conclusion. First, we have (at least once) read *Cottrell* for what it could tell us about the *Fourth* Amendment excessive-force standard. In *Garrett v. Athens-Clarke County*, we analyzed a Fourth Amendment excessive-force claim and explained *Cottrell* as having "conclude[d] officers did not use excessive force, although [the] arrestee died of positional asphyxia, where officers placed [the] arrestee in handcuffs and

43

leg restraints after a 20-minute struggle and put him in a prone position in the back of a police car." 378 F.3d 1274, 1281 (11th Cir. 2004). *See also Calhoun*, 360 F. Supp. 2d at 1272–73 (citing *Cottrell* for the proposition that we have "indirectly countenanced the application of the Fourth Amendment to post-arrest, pre-detention excessive-force claims"). As I read *Garrett* and the follow-on *Calhoun*, they reveal, at the very least—and contrary to what other circuits have said—that *Cottrell* didn't commit us to the Fourteenth Amendment side of this split.

To sum up: Other circuits disagree about whether claims like Crocker's—brought by an individual who has been arrested but hasn't yet received a judicial determination of probable cause—arise under the Fourth or Fourteenth Amendment.[3] Our own precedent hasn't settled the issue, either. If I'm right about that, then a future panel might have to answer the questions this case only caused us to ask.

---

[3] Note that because the practical consequences of the split aren't what they used to be pre-*Kingsley*, the Supreme Court may have less reason to step in and resolve any conflict between the circuits. *Cf. Piazza*, 923 F.3d at 952–53 ("[I]nasmuch as it entails an inquiry into the objective reasonableness of the officers' actions, the Fourteenth Amendment standard has come to resemble the test that governs excessive-force claims brought by arrestees under the Fourth Amendment."); *Miranda-Rivera*, 813 F.3d at 70 ("Since *Kingsley* has extended the objective reasonableness standard for use of force from the arrest stage through the probable cause hearing, whether the Fourth or Fourteenth Amendment standard applies presents less of a problem in cases like this one than before."). For that matter, I suppose that insofar as the so-what factor isn't what it used to be, our en banc court may have less incentive to untangle any knots in our precedent in this area.

**B**

If and when that happens, I'd recommend that we (1) draw the line between arrestees and pretrial detainees in accord with *Bell v. Wolfish*, 441 U.S. 520 (1979), and thus (2) analyze the excessive-force claims of all pre-probable-cause-determination arrestees under the Fourth Amendment.

Although we've said that "the line is not always clear as to when an arrest ends and pretrial detainment begins," *Garrett*, 378 F.3d at 1279 n.11, I think that line can be clearly drawn—in many cases, anyway—at the probable-cause hearing.[4]  The Supreme Court has told us that a pretrial detainee is a person who has had "a 'judicial determination of probable cause as a prerequisite to [the] extended restraint of [his] liberty following arrest.'"  *Bell*, 441 U.S. at 536 (quoting *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975)) (alterations in original).  It has also told us that "the Fourth Amendment requires a timely judicial determination of probable cause as a prerequisite to detention."  *Gerstein*, 420 U.S. at 126.  Taken together, I understand *Bell* and *Gerstein* to mean that until a judge has weighed in on whether probable cause exists to detain someone, he remains an arrestee and is

---

[4] I can imagine that the analysis might (?) look different for someone who has already had a judicial determination of probable cause—*e.g.*, when he is arrested pursuant to a valid warrant. *Cf. Frohmader v. Wayne*, 958 F.2d 1024, 1026 (10th Cir. 1992) (explaining that "claims of post-arrest excessive force by arrestees . . . who are detained without a warrant, are governed by the 'objective reasonableness' standard of the Fourth Amendment . . . until they are brought before a judicial officer for a determination of probable cause to arrest").

45

thus entitled to (but only to) Fourth-Amendment protection from excessive force. *Cf. Graham*, 490 U.S. at 395 n.10 (reserving "the question whether the Fourth Amendment continues to provide individuals with protection against the deliberate use of excessive physical force beyond *the point at which arrest ends and pretrial detention begins*" (emphasis added)).

Several other circuits have taken that general approach. In *Estate of Booker v. Gomez*, for instance, the Tenth Circuit clearly distinguished an arrestee from a pretrial detainee in explaining which amendments control which excessive-force claims. *See* 745 F.3d 405, 419 (10th Cir. 2014). The court there concluded that "the Fourth Amendment, not the Fourteenth, governs excessive force claims arising from treatment of an arrestee detained without a warrant and prior to any probable cause hearing." *Id.* (quotation marks and alterations omitted).[5] By contrast, the court held, the Fourteenth Amendment governs an excessive-force claim made by a pretrial detainee, which it defined to mean "one who has had a 'judicial determination of probable cause as a prerequisite to [the] extended restraint of [his] liberty following arrest.'" *Id.* (quoting *Bell*, 441 U.S. at 536) (alterations in original). Other circuits follow a similar (albeit not identical)

---

[5] Note that the *Estate of Booker* court also held that "the Fourteenth Amendment standard governs excessive force claims arising from post-arrest and pre-conviction treatment if the arrestee has been taken into custody pursuant to a warrant supported by probable cause." 745 F.3d at 421.

analysis. *See, e.g., Burchett v. Kiefer*, 310 F.3d 937, 945 (6th Cir. 2002) (holding that the detention of arrestee in hot patrol car for three hours with no ventilation "violated his Fourth Amendment right against unreasonable seizures"); *Fontana v. Haskin*, 262 F.3d 871, 879–80 (9th Cir. 2001) (holding that "[t]he trip to the police station is a 'continuing seizure' during which the police are obliged to treat their suspects in a reasonable manner" under the Fourth Amendment); *Wilson*, 209 F.3d at 716 (observing that Fourth Amendment standards apply "not only to the act of arrest, but also to use of force against an arrestee who was restrained in the back of a police car"); *cf. United States v. Johnstone*, 107 F.3d 200, 206 (3d Cir. 1997) (applying Fourth Amendment standards to conduct occurring after the arrestee had been transported to the police station on the theory that "a 'seizure' can be a process, a kind of continuum, and is not necessarily a discrete moment of initial restraint"). *See generally* Catherine T. Struve, *The Conditions of Pretrial Detention*, 161 U. Pa. L. Rev. 1009, 1063–64 (2013) (advocating this approach).

One might object to this general approach on the ground that it necessarily embodies a "continuing seizure" theory, about which we (and others) have expressed "doubts," *Kingsland v. City of Miami*, 382 F.3d 1220, 1236 (11th Cir. 2004), and "questions," *Whiting v. Traylor*, 85 F.3d 581, 584 (11th Cir. 1996). *See also Reed v. City of Chicago*, 77 F.3d 1049, 1052 & n.3 (7th Cir. 1996). Our reticence is well-founded; the Supreme Court has said, after all, that "[a] seizure is

a single act, and not a continuous fact." *California v. Hodari D.*, 499 U.S. 621, 625 (1991) (quoting *Thompson v. Whitman*, 85 U.S. 457, 471 (1873)); *see also Torres v. Madrid*, No. 19-292, 2021 WL 1132514, at *9 (U.S. Mar. 25, 2021) (similar).  And that view finds support in the original public meaning of the Fourth Amendment.  *See Manuel v. City of Joliet*, 137 S. Ct. 911, 927 (2017) (Alito, J., dissenting) ("Dictionary definitions from around the time of the adoption of the Fourth Amendment define the term 'seizure' as a single event—and not a continuing condition.").  There's good reason, then, to be suspicious of a flabby conception of "seizure."

Even so, it seems to me that what transpires between the initial act of a warrantless arrest and the subsequent probable-cause determination may be considered a "seizure" without doing violence to the Fourth Amendment—or, for that matter, even requiring the "continuing" modifier.[6]  Consider Justice Alito's explanation in *Manuel*:

> [W]hen an arrest is made without a warrant, the arrestee, generally within 48 hours, must be brought before a judicial officer, who then completes the arrest process by making the same determination that would have been made as part of the warrant application process.  *Thus, this appearance is an integral part of the process of taking the arrestee into custody and easily falls within the meaning of the term 'seizure.'*

---

[6] Tellingly, I think, in the same decision in which it again rejected the "continuing seizure" theory, the Seventh Circuit took for granted "the fact that the 'seizure' of an arrestee ends *after* the *Gerstein* hearing."  *Reed*, 77 F.3d at 1052 (emphasis added).

137 S. Ct. at 928 (Alito, J., dissenting) (emphasis added) (citations omitted).  That makes perfect sense to me.

And happily, that understanding of "seizure" supports drawing a nice, bright line between the Fourth and Fourteenth Amendments at the probable-cause hearing.  *Cf. United States v. Johnson*, 921 F.3d 991, 1004–06 (11th Cir. 2019) (en banc) (Newsom, J., concurring) (stressing the importance of bright lines and "clear rule[s]" in Fourth Amendment jurisprudence).  That is, if that which constitutes an "integral part of the process of taking the arrestee into custody" counts as part of the "seizure," then when a person in Crocker's position makes an allegation of excessive force, "the Fourth Amendment provides an explicit textual source of constitutional protection."  *Graham*, 490 U.S. at 395.  (And as that rationale applies here, I can hardly think of something more "integral" to taking an arrestee into custody than holding him in a squad car.)  On that understanding of what constitutes a seizure, the Fourth Amendment, and "not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims."  *Id.*[7]

---

[7] In *Torres v. Madrid*, the Supreme Court held that "the application of physical force to the body of a person with intent to restrain is a seizure even if the person does not submit and is not subdued."  No. 19-292, 2021 WL 1132514, at *10 (U.S. Mar. 25, 2021).  That rule, the majority emphasized, was a "narrow" one.  *Id.* at *7.  So, although the Court explained that "the application of force completes an arrest even if the arrestee eludes custody," *id.*, it's not immediately apparent (to me, at least) whether and to what extent *Torres* impacts the circuit-splitting questions that I've discussed here.  At the very least, the extensive back and forth between the *Torres* majority and dissent concerning the original meaning of "seizures" shows that those looking for answers to these questions would do well to attend closely to text, history, and tradition.  *Compare id.* at *3–*10, *with id.* at *10–*20 (Gorsuch, J., dissenting).

49

\* \* \*

Our duty to follow the Constitution and the Supreme Court's decisions requires us to reject an in-there-somewhere approach to excessive-force claims brought under § 1983. We didn't have to go to the roots of Crocker's claim to know that it could bear no fruit, but in another case, our court may need to dig deeper. If so, I hope that panel will distinguish between arrestees and pretrial detainees and clarify the analytical framework that applies to the excessive-force claims of both.

MARTIN, Circuit Judge, concurring in part and dissenting in part:

As set forth in the majority opinion, James Crocker witnessed a fatal car accident and stood in the median of I-95 photographing the scene. Deputy Steven Beatty approached him, seized his phone, arrested him, and locked him in the back of a hot patrol car for almost a half hour. Mr. Crocker sued Deputy Beatty, alleging, as relevant here, unlawful seizure of his phone in violation of the First Amendment, false arrest in violation of the Fourth Amendment and state law, and excessive force in violation of the Fourteenth Amendment. This appeal asks us to decide whether the District Court properly entered summary judgment in favor of Deputy Beatty on these claims.

I agree with the majority that Deputy Beatty had probable cause to arrest Mr. Crocker for violating Florida Statute § 316.1945(1)(a)(11). As a result, Mr. Crocker's Fourth Amendment false arrest claim is barred by qualified immunity. Also, since Deputy Beatty had probable cause to arrest Mr. Crocker, his state law false arrest claim fails as well. But I part ways with the majority as to Mr. Crocker's First and Fourteenth Amendment claims. I do not think Deputy Beatty can properly be granted qualified immunity on either of those claims, so I would reverse the District Court's grant of summary judgment on those issues. I therefore respectfully dissent.

51

**I.**

I will begin with Mr. Crocker's First Amendment claim.  Mr. Crocker argues that Deputy Beatty violated his First Amendment rights when he seized Crocker's phone while he was photographing the accident scene.  The District Court held that Deputy Beatty was entitled to qualified immunity on this claim, and the majority opinion affirms.  Maj. Op. at 9–15.  The majority says the law underlying Mr. Crocker's First Amendment claim was not clearly established at the time Deputy Beatty seized his phone.  Id. at 10–11.  Specifically, the majority opinion says this Court's opinion in Smith v. City of Cumming, 212 F.3d 1332 (11th Cir. 2000), does not obviously apply to the facts here.  Maj. Op. at 10–15.  But I think the majority cabins Smith too narrowly.  In my view, Smith clearly establishes that Mr. Crocker had a right to photograph the accident scene and I would therefore reverse the grant of qualified immunity to Deputy Beatty on this claim.

In Smith, our Court addressed a claim from plaintiffs who said they were prevented from videotaping police activity in violation of their First Amendment rights.  212 F.3d at 1332.  We held that the Smiths "had a First Amendment right, subject to reasonable time, manner and place restrictions, to photograph or videotape police conduct."  Id. at 1333.  And we explained that this is because "[t]he First Amendment protects the right to gather information about what public

officials do on public property, and specifically, a right to record matters of public interest." Id. (collecting cases).

The majority acknowledges that Smith announced a "broad statement of First Amendment principle," but it says this principle does not obviously apply to the facts here. Maj. Op. at 9–11 (quotation marks omitted) (alteration adopted). More to the point, the majority says Smith's rule does not obviously apply to Mr. Crocker who was "spectating on the median of a major highway at the rapidly evolving scene of a fatal crash." Id. at 10 (quotation marks omitted). According to the majority, because Smith "provided few details regarding the facts of the case" it cannot provide officers "'fair warning' under other circumstances" such as this one. Id. at 10–11 (quotation marks omitted).

I read Smith differently. It is true that Smith does not detail the specific facts presented there. See Smith, 212 F.3d at 1332–33. But for me, the lack of factual detail does not do away with the right Smith announced. To the contrary, the broad pronouncement in Smith underscores the right's general applicability. Smith says there is "a First Amendment right . . . to photograph or videotape police conduct." Id. at 1333. This statement is unambiguous and not couched in specifics that limit its application. Instead, the right is limited only by "reasonable time, manner and place restrictions." Id. And the contours of the right announced in Smith do not require such precise definition. Unlike findings about the use of

excessive force, for example, it is usually easy enough to know whether a plaintiff was recording police activity.  Indeed, a number of district courts within this Circuit have relied on Smith to determine, in distinct factual contexts, that the right to record police activity is clearly established.[1]  I thus read Smith to clearly establish a general rule that the First Amendment protects a person's right to record police conduct—subject only to reasonable time, place, and manner restrictions.[2]

Smith's general rule applies here.  Taking the facts in the light most favorable to Mr. Crocker, he was photographing police conduct.  When Deputy

---

[1] See, e.g., Bacon v. McKeithen, No. 5:14-cv-37-RS-CJK, 2014 WL 12479640, at *4–5 (N.D. Fla. Aug. 28, 2014) (unpublished) (denying qualified immunity and concluding that Smith clearly established the right to videotape a police officer without his consent at a routine traffic stop); Abella v. Simon, 831 F. Supp. 2d 1316, 1329–30, 1352 (S.D. Fla. 2011) (denying qualified immunity and concluding that Smith clearly established Mr. Abella's First Amendment right to photograph a police officer who had been trailing him), vacated in part on other grounds, 482 F. App'x 522 (11th Cir. 2012) (per curiam) (unpublished); id. at 1352 n.27 (distinguishing Kelly v. Borough of Carlisle, 622 F.3d 262 (3d Cir. 2010), as relying on cases from the Third Circuit, and concluding that "in the Eleventh Circuit, Smith controls and the Court is compelled to find the law is clearly established"); Dunn v. City of Fort Valley, 464 F. Supp. 3d 1347, 1355–56, 1366–67 (M.D. Ga. 2020) (denying qualified immunity and citing Smith to conclude that Mr. Dunn had a clearly established First Amendment right to take photographs and videos inside the Police Department building and around the grounds); Johnson v. DeKalb County, 391 F. Supp. 3d 1224, 1234, 1250–51 & n.214 (N.D. Ga. 2019) (denying qualified immunity and citing Smith to conclude that Ms. Johnson had a clearly established First Amendment right to film an arrest).

[2] Contrary to the majority's suggestion, Smith's reference to time, place, and manner restrictions does not confine the right it clearly established to public forums.  See Maj. Op. at 12.  Of course, the government can implement time, place, and manner restrictions in nonpublic forums as well. M.N.C. of Hinesville, Inc. v. U.S. Dep't of Defense, 791 F.2d 1466, 1474 (11th Cir. 1986) ("As in all other forums, the government may subject speech in nonpublic forums to reasonable content-neutral, i.e., time, place, and manner, restrictions.").  But in any event, by its own terms Smith's right applies in public and the median is obviously in public.  See Smith, 212 F.3d at 1333 ("The First Amendment protects the right to gather information about what public officials do on public property[.]").

54

Beatty seized his phone, Mr. Crocker was photographing the scene of a fatal car accident and the emergency response, including police activity, surrounding it. This record reveals no "reasonable time, manner and place restrictions," limiting Mr. Crocker's speech here. See Smith, 212 F.3d at 1333. Permissible time, place, and manner restrictions are content-neutral restrictions on First Amendment conduct that are supported by a substantial government interest and do not unreasonably limit alternative avenues of communication. City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 47, 106 S. Ct. 925, 928 (1986). They are, by their nature, rules, not discretionary enforcement decisions by individual police officers. See Forsyth County v. Nationalist Movement, 505 U.S. 123, 130, 112 S. Ct. 2395, 2401 (1992) ("A government regulation that allows arbitrary application is inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view." (quotation marks omitted)). Again, this record suggests no such rules were in place here. And indeed, accepting Mr. Crocker's allegations as true, even Deputy Beatty understood that Florida's statutes regarding limited access facilities did not bear on Crocker's First Amendment activity. Mr. Crocker says when he asked Deputy Beatty whether it was illegal to photograph the scene, Beatty replied "no, but now your phone is evidence of the State."

55

The right to record police activity is important not only as a form of expression, but also as a practical check on police power. Recordings of police misconduct have played a vital role in the national conversation about criminal justice for decades. I read today's opinion to parse this critical right too narrowly. I would hold that Mr. Crocker's First Amendment right to record the fatal car crash was clearly established and reverse the grant of qualified immunity to Deputy Beatty.

## II.

Now for Mr. Crocker's Fourteenth Amendment claim. Mr. Crocker argues that Deputy Beatty used excessive force in violation of the Fourteenth Amendment when he detained Crocker in a hot patrol car for approximately half an hour. The District Court held that Deputy Beatty was entitled to qualified immunity on this claim, and the majority now affirms. Yet in my view, Mr. Crocker presented sufficient evidence to create a dispute of fact about whether Deputy Beatty acted with express intent to punish him. For this reason, summary judgment on this claim is not warranted.

## A.

Before turning to the proper analysis under the Fourteenth Amendment, I will address a question the majority opinion injects into this case. That question is which amendment—the Fourth or the Fourteenth—governs Mr. Crocker's claim.

See Maj. Op. at 22–24. Despite the majority's discussion to the contrary, Mr. Crocker made clear, both before the District Court and now on appeal, that he is bringing his excessive force claim solely under the Fourteenth Amendment. And while Deputy Beatty notes that the line between arrest and pretrial detention is not clear, he makes no argument that the Fourth Amendment, rather than the Fourteenth, should govern. Despite acknowledging that application of one amendment over the other does not change the outcome of Mr. Crocker's excessive force claim under its interpretation, the majority opinion analyzes Crocker's claim under both the Fourth and Fourteenth Amendments. Id. at 24–36. In addition to authoring the majority opinion, Judge Newsom also writes a separate concurrence to say that, in his view, it is the Fourth Amendment that should apply in these post-arrest, pre-custody situations. Conc. Op. at 45.

Judge Newsom is right in pointing out that this Court has not committed itself to either outcome. See id. at 42–44. And this is not the context in which to decide this question. The parties have treated and argued this case as a Fourteenth Amendment case, and I would decide it as such. In the past, and in the absence of an affirmative answer as to when arrest ends and pretrial detention begins, this Court has deferred to the characterization given by the parties, where they agree. See Hicks v. Moore, 422 F.3d 1246, 1253 n.7 (11th Cir. 2005) ("We underline that Defendants never argue that the strip search or fingerprinting was separate from

Plaintiff's seizure; so we—will assume (for this case) Plaintiff was still being seized and—analyze the claim under the Fourth Amendment"). I think this is the best approach and would do the same in this case. I would therefore apply the Fourteenth Amendment to Mr. Crocker's excessive force claim.

That is not to say that in a future case where the question is fully briefed and argued I would necessarily hold that the Fourteenth Amendment always governs this situation. Here, however, we have no briefing on the question and both parties have understood Mr. Crocker's excessive force claim to travel under the Fourteenth Amendment. I would therefore analyze whether Deputy Beatty used excessive force against Mr. Crocker when he locked him in a hot patrol car and left him there, as the parties did, under the Fourteenth Amendment alone.

B.

The Fourteenth Amendment analysis does not bestow qualified immunity on Deputy Beatty for the excessive force claim. I agree with the majority that the District Court's analysis of this claim was wrong because the court failed to apply the Supreme Court's decision in Kingsley v. Hendrickson, 576 U.S. 389, 135 S. Ct. 2466 (2015). See Maj. Op. at 25–26. I also agree that the force used here was not objectively unreasonable.[3] See id. at 30. But again, I part ways with the majority

---

[3] I do not view the force used here to rise to the level of objectively unreasonable, but neither would I characterize it—as the majority does—as de minimis. See Maj. Op. at 36.

58

insofar as I do not read <u>Kingsley</u> to do away with Fourteenth Amendment liability where an officer applies objectively reasonable force with an express intent to punish. I say Mr. Crocker presented sufficient evidence to create a dispute of fact about whether Deputy Beatty acted with express intent to punish him.[4] And since it was clearly established at the time of Mr. Crocker's arrest that applying force with the express intent to punish a pretrial detainee violated the Fourteenth Amendment, Deputy Beatty is not entitled to qualified immunity on this claim. See <u>Jacoby v. Baldwin County</u>, 835 F.3d 1338, 1344 (11th Cir. 2016) ("To [overcome qualified immunity], the plaintiff must: (1) allege facts that establish that the officer violated his constitutional rights; and (2) show that the right

---

[4] Mr. Crocker explicitly says in his reply brief that Deputy Beatty violated his Fourteenth Amendment rights by inflicting force with the express intent to punish him. See Reply Br. of Appellant 10 ("As the <u>Kingsley</u> Court noted . . . ''punishment' can consist of action taken with an 'expressed intent to punish.' When someone tells you after you beg for relief, 'it's not meant to be comfortable, sir,' that is punishment." (citations omitted)). However, while issues not raised in the initial brief generally are considered abandoned, "briefs should be read liberally to ascertain the issues raised on appeal." <u>Allstate Ins. Co. v. Swann</u>, 27 F.3d 1539, 1542 (11th Cir. 1994). Viewed liberally, Mr. Crocker's briefing raises the issue of the District Court's failure to apply <u>Kingsley</u> when evaluating his Fourteenth Amendment excessive force claim. And Mr. Crocker discussed express intent to punish before the District Court. Doc. 156 at 15–16 ("The placement of [Crocker] in the back of the patrol car while turning the air off demonstrates a conscious decision by Beatty to punish [Crocker] . . . ."). However, even accepting the majority's concerns, see Maj. Op. at 29–30, "application of the waiver rule would be unduly harsh," <u>Allstate</u>, 27 F.3d at 1542 (considering issue not raised in initial brief where party preserved it in the lower court, discussed the circumstances of the relevant ruling in its initial brief, and argued the point in reply).

involved was clearly established at the time of the putative misconduct." (quotation marks omitted) (alteration adopted)).

I will now discuss my reading of Kingsley. Then I will set out why, under Kingsley, Mr. Crocker has alleged facts that establish Deputy Beatty violated his constitutional right. Finally I will address whether that right was clearly established at the time of Mr. Crocker's arrest.

1.

In Kingsley, the Supreme Court considered whether, in order to prove an excessive force claim, a pretrial detainee must show that the official subjectively intended to violate the detainee's rights. 576 U.S. at 391–92, 135 S. Ct. at 2470. The Court concluded that the answer to that question is no: "the defendant's state of mind is not a matter that a plaintiff is required to prove." Id. at 395, 135 S. Ct. at 2472. Instead, it is sufficient to prove that an officer inflicted objectively unreasonable force. Id. According to the majority opinion, Kinglsey's holding that pretrial detainees can prove excessive force simply by establishing that an official used objectively unreasonable force means that proof of objectively unreasonable force is the only way pretrial detainees can prove excessive force in violation of the Fourteenth Amendment. Maj. Op. at 26–29. In the majority's view, Kingsley forecloses "the possibility of an excessive-force violation, even in circumstances where the use of force is objectively reasonable, on the ground that

60

some sinister purpose is allegedly afoot." Id. at 28 n.15. But the majority misreads Kingsley. Kingsley did nothing to disallow Fourteenth Amendment claims based on express intent to punish, and those claims remain viable today.

Importantly, Kingsley did not wholly abrogate the existing landscape of Fourteenth Amendment excessive force claims. The Supreme Court in Kingsley merely clarified one of the standards under which pretrial detainees can show "the use of excessive force that amounts to punishment." 576 U.S. at 397, 135 S. Ct. at 2473. This is evident from the Court's analysis. The Supreme Court understood Kingsley's holding that pretrial detainees are not required to prove subjective intent to be "consistent with [its] precedent"—specifically, with Bell v. Wolfish, 441 U.S. 520, 99 S. Ct. 1861 (1979). Kingsley, 576 U.S. at 397, 135 S. Ct. at 2473. It explained that Bell set out two standards under which pretrial detainees can establish unconstitutional punishment. Id. at 398, 135 S. Ct. at 2473. The first Bell standard is subjective: "such 'punishment' can consist of actions taken with an 'expressed intent to punish.'" Id. (quoting Bell, 441 U.S. at 538, 99 S. Ct. at 1873–74). The second is objective: "in the absence of an expressed intent to punish, a pretrial detainee can nevertheless prevail by showing that the actions are not 'rationally related to a legitimate nonpunitive governmental purpose' or that the actions 'appear excessive in relation to that purpose.'" Id. (quoting Bell, 441 U.S. at 561, 99 S. Ct. at 1886).

61

Kingsley clarified that Bell's objective standard does not involve subjective considerations. The Court explained, for example, that its holding was consistent with cases postdating Bell because those cases did not suggest that "application of Bell's objective standard should involve subjective considerations." Id. at 399, 135 S. Ct. at 2474 (emphasis added). But the Court never said it was doing away with Bell's subjective standard, under which pretrial detainees can establish a violation of their Fourteenth Amendment rights by showing that an official inflicted force with an express intent to punish. See id. at 397–402, 135 S. Ct. at 2473–76. Much less did the Court say it was doing away with Bell's subjective standard solely for excessive force claims while leaving it in place for other claims of punishment, as the majority opinion suggests. See Maj. Op. at 27–28. The Supreme Court tells us that it "does not normally overturn, or so dramatically limit, earlier authority sub silentio." Shalala v. Ill. Council on Long Term Care, Inc., 529 U.S. 1, 18, 120 S. Ct. 1084, 1096 (2000); see also Johnson v. NPAS Sols., LLC, 975 F.3d 1244, 1260 n.12 (11th Cir. 2020) (recognizing this principle). Surely this principle holds especially true where, as here, the Court expressly stated that its holding is "consistent with" Bell. Kingsley, 576 U.S. at 397, 135 S. Ct. at 2473.

Indeed, Kingsley says nothing about redefining what constitutes punishment in the excessive force context. The Fourteenth Amendment's Due Process Clause "prohibits a state from punishing a pretrial detainee at all until he is lawfully

62

convicted of a crime." McMillian v. Johnson, 88 F.3d 1554, 1564 (11th Cir. 1996). In other words, an official violates a pretrial detainee's Fourteenth Amendment rights if he subjects the detainee to punishment. In the context of the Fourteenth Amendment, then, excessive force means "excessive force that amounts to punishment." Kingsley, 576 U.S. at 397, 135 S. Ct. at 2473 (quotation marks omitted) (emphasis added). And one of the ways an action "amounts to punishment" is if it was "taken with an expressed intent to punish." Id. at 397–98, 135 S. Ct. at 2473 (quotation marks omitted). It has thus long been understood, prior to Kingsley, that proof of express intent to punish is alone sufficient to establish a Fourteenth Amendment violation.[5] Kingsley—a decision that sought to make it easier for pretrial detainees to vindicate their rights—cannot properly be read to do away with this method of proving Fourteenth Amendment violations for excessive force claims when it said nothing about having done so.

---

[5] See, e.g., Blackmon v. Sutton, 734 F.3d 1237, 1241–43 (10th Cir. 2013) (Gorsuch, J.) (finding Fourteenth Amendment excessive force violation where juvenile detention officials used restraint chair with express purpose of punishing detainee); McMillian, 88 F.3d at 1564–65 (holding that pretrial detainee stated Fourteenth Amendment claim where he presented evidence that officials placed him on death row with express goal of punishment); Putman v. Gerloff, 639 F.2d 415, 419–20 (8th Cir. 1981) (explaining that, for a trial regarding a claim that chaining and handcuffing pretrial detainees overnight violated the Fourteenth Amendment, "the jury could find that the defendants' conduct was punishment on the basis of direct evidence of intent to punish").

Based on my reading of <u>Kingsley</u>, I would ask whether the evidence in this case demonstrates that Deputy Beatty locked Mr. Crocker in the back of a hot car for nearly half an hour with the goal of punishing him.[6]

2.

And I see sufficient evidence here to create a dispute of fact about whether Deputy Beatty locked Mr. Crocker in the hot car with an express intent to punish him. In a sworn affidavit, Mr. Crocker stated that Deputy Beatty intentionally turned off the air conditioning in the car before leaving Crocker inside with the windows rolled up. The heat caused Mr. Crocker to experience anxiety, difficulty breathing, and profuse sweating. When Deputy Beatty briefly returned to the car, Mr. Crocker "begged" him for relief and told him he was "about to die in here." Deputy Beatty responded that Mr. Crocker was not meant to be comfortable and again left him in the car with the windows rolled up and no air conditioning. Together, Deputy Beatty's actions and statements create a dispute of fact as to whether he subjected Mr. Crocker to extreme environmental conditions with the sole purpose of punishing him.

---

[6] The majority says this standard would permit Fourteenth Amendment liability where an official expressly intends to punish yet uses no force at all. <u>See</u> Maj. Op. at 28–29. But, of course, the application of de minimis force (or, as in the majority's example, no force) cannot support a claim for excessive force. <u>Nolin v. Isbell</u>, 207 F.3d 1253, 1257 (11th Cir. 2000). As noted earlier, <u>see supra</u> at 58 n.3, I do not view the force inflicted in this case to be de minimis.

Notably, there is a complete lack of evidence that Deputy Beatty acted with the goal of furthering any "permissible governmental objective." Piazza v. Jefferson County, 923 F.3d 947, 952 (11th Cir. 2019). Mr. Crocker was subdued and handcuffed in the back seat of a police cruiser. Nothing in the record suggests that Deputy Beatty had any reason to turn off the air conditioning in his car other than to cause Mr. Crocker to suffer. This and the fact that Deputy Beatty ignored Mr. Crocker's pleas for fresh air and told him he was "not meant to be comfortable" further reinforce Crocker's claim that Beatty's only objective was to inflict punishment. This punishment was plainly prohibited in Bell, 441 U.S. at 538, 99 S. Ct. at 1873–74, and remains prohibited after Kingsley, 576 U.S. at 397–98, 135 S. Ct. at 2473. On this record, I believe the District Court erred by failing to find a dispute of fact about whether Deputy Beatty kept Mr. Crocker in a hot car with the express intent of punishing him, in violation of his Fourteenth Amendment rights.

### 3.

Finally I address whether, at the time of Mr. Crocker's arrest, it was clearly established that Deputy Beatty's conduct violated the Fourteenth Amendment. The majority gets it right here, as in Patel v. Lanier County, 969 F.3d 1173, 1184–88 (11th Cir. 2020), in saying that the mere act of detaining Mr. Crocker in the back seat of a hot car for approximately 30 minutes was not clearly established as

65

amounting to objectively unreasonable force.  See Maj. Op. at 34–35.  However, Patel did not present the question of whether it was clearly established that prolonged detention in a hot car for the express purpose of inflicting punishment amounted to excessive force under Bell's subjective test.  "Where the official's state of mind is an essential element of the underlying violation," as it is under Bell, "the [official's] state of mind must be considered in the qualified immunity analysis or a plaintiff would almost never be able to prove that the official was not entitled to qualified immunity."  Walker v. Schwalbe, 112 F.3d 1127, 1132 (11th Cir. 1997).  Here, Mr. Crocker presented evidence sufficient to raise a dispute of fact as to whether Deputy Beatty locked him in the back of a hot patrol car with the express intent of punishing him.

Since Mr. Crocker has established a genuine issue of material fact about whether Deputy Beatty acted with express intent to punish, Beatty is not entitled to qualified immunity.  We have held that "Bell's prohibition on any pretrial punishment, defined to include conditions imposed with an intent to punish," should make it "obvious to all reasonable officials" that the Fourteenth Amendment prohibits imposing detention conditions with the express goal of punishment.  McMillian, 88 F.3d at 1565.  Based on this rationale, McMillian held that it was clearly established that placing a pretrial detainee on death row for the express purpose of punishing him violated the Fourteenth Amendment even though

66

there was "no case with facts similar to McMillian's allegations." Id. The imposition of restrictive conditions with the express goal of punishment was sufficient to put the officers in McMillian on notice that their actions violated the Fourteenth Amendment.

So too here. At the time of Mr. Crocker's arrest, it was clear enough that police officers may not intentionally expose pretrial detainees to extreme environmental conditions for the sole purpose of causing suffering. This "broad statement of principle" clearly established Mr. Crocker's right to be free of intentionally inflicted punishment. Lewis v. City of West Palm Beach, 561 F.3d 1288, 1291–92 (11th Cir. 2009). And it should have been "obvious" to Deputy Beatty that the Constitution prohibited him from intentionally turning off his air conditioning and leaving Mr. Crocker in the back of his hot patrol car with the sole purpose of causing him to suffer. McMillian, 88 F.3d at 1565. I would therefore hold that the District Court erred in granting summary judgment to Deputy Beatty on this claim.

I respectfully dissent.